Joseph **CAIRNS**, et al., Plaintiffs,

v.

**BRIDGESTONE/FIRESTONE, INC.**, et al., Defendants.

No. 91–CV–1553.

United States District Court, N.D. Ohio, E.D.

June 4, 1992.

Paul Leslie Jackson, Gary W. Spring, Roetzel & Andress, Akron, Ohio, for plaintiffs.

Robert S. Walker, Daniel C. Hagen, Jones, Day, Reavis & Pogue, North Point, Cleveland, Ohio, Peter C. Rousos, Firestone Tire & Rubber Co. Dept. of Law, Akron, Ohio, Willis J. Goldsmith, Richard F. Shaw, Jones, Day, Reavis & Pogue, Washington, D.C., for defendants.

## ORDER

SAM H. BELL, District Judge.

Currently pending before the court in the above-captioned matter are cross motions for summary judgment filed by the adversaries to this cause pursuant to Fed. R.Civ.P. 56. Plaintiffs Joseph Cairns, Tom Salisbury, Robert Lyman Smith, Martha Nelson, and John Jarema instituted this action on August 7, 1991 with the filing of a four-count complaint against defendants Bridgestone/Firestone, Inc. (hereinafter the Company) and the Bridgestone/Firestone, Inc. Pension Board (hereinafter the Pension Board). An amended complaint was filed by plaintiffs on August 28, 1991. The amended complaint seeks recovery under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, in the first and third counts. Plaintiffs also allege breach of a settlement agreement in the second count.[1]

## I. BACKGROUND

Plaintiffs are former salaried employees and current retirees of the Company. In 1985, they and others brought a class action against the Company (then known as the Firestone Tire and Rubber Company) alleging violations of ERISA and seeking an injunction against the implementation of a 1984 ERISA benefits plan and a declaration seeking reinstatement of a 1982 ERISA benefits plan. *Kennedy, et al. v. Firestone Tire & Rubber Company*, Case No. C85-2084-A (N.D.Ohio, Manos, J.). The parties to that cause engaged in lengthy settlement negotiations which culminated in a settlement agreement on June 2, 1989 under which the Company is obligated to provide lifetime benefits to thousands of retirees. The settlement agreement was reached as a result of negotiations over the terms of the 1984 ERISA plan and, in relevant part, delineates the Company's obligation to provide lifetime ERISA benefits to thousands of retirees.

On July 1, 1988, approximately one year before the parties reached settlement in the *Kennedy* suit, Congress enacted the Medicare Catastrophic Coverage Act of 1988 (the MCCA). The MCCA substantially increased Medicare Part A, Part B, and prescription drug benefits as follows: Part A benefits would increase on January 1, 1989; Part B benefits would increase on January 1, 1990; and prescription drug benefits would increase on January 1, 1991. The MCCA also contained a "Maintenance of Effort" provision which required employers to pass on any cost savings inuring to them from the MCCA for the year 1989 onto their employee beneficiaries. During the settlement negotiations, the Company took into account the effect the MCCA would have in the future on its obligation to provide these lifetime benefits to the retirees

---

[1]. The third count alleges breach of fiduciary duty, while the fourth charges as an alternative that if defendants are not fiduciaries, they are liable for inducing the actual fiduciaries to breach their duties. Due to the fact that defendants admit they are the relevant fiduciaries, *see* Answer at ¶ 37, count four of the amended complaint is rendered moot.

and the costs thereof. *See* Affidavit of Jeffrey Pennock, former Director of Benefits and Risk Management for the Company. Specifically, the Company based its proposals during the settlement negotiations in part on the savings to it resulting from the increase in benefits conferred by the MCCA. *Id.* Due to the fact that Medicare would provide these benefits in the future, in other words, the Company's costs incurred in providing lifetime benefits would be less than if the MCCA had not been enacted. *See also* Affidavit of Jeffrey Gathers, consulting actuary in the management consulting firm of Towers, Perrin, Forster and Crosby.

The parties to the *Kennedy* action took into account the possibility that governmental benefits might be reduced in the future thereby causing the Company to incur increased costs in ensuring that continuing lifetime benefits are provided. This mutual concern is manifested in the settlement agreement in a provision which provides that if the Company's costs increase due to a reduction in governmental benefits, it can pass these costs on to the retirees in the form of a supplemental premium. The relevant portion of the settlement agreement provides as follows:

> Notwithstanding any other provision to this Settlement Agreement, Firestone will not assume any increased costs resulting from any reduction of benefits under Medicare or any other government health care or related program, but shall collect a supplemental premium in the manner provided in Paragraph 7.F and in an amount actuarially determined by Firestone to cover increased costs resulting from any such reduction of benefits.

*Id.* at ¶ 7(H).

While the parties were negotiating the settlement agreement, they were also negotiating the language of a forthcoming benefit plan styled the Comprehensive Medical Expense Benefits Plan (hereinafter the Plan) and a summary description of this Plan. The Plan was based upon the settlement agreement and was implemented approximately one month later, on July 14, 1989. The Plan contains a provision nearly identical to that just quoted from the settlement agreement, as follows:

> The Company, in addition to the increase in premium contributions permitted by Subsections (b) and (c), may impose and collect supplemental premium contributions in an amount actuarially determined from time to time by the Company, without regard to the limitation on premium contribution increases contained in Subsection (b), equal to the increased cost of the Plan resulting from any reduction of benefits provided as of January 1, 1989 by Medicare or any other governmental health care or related program.

*Id.* at § 6.03(f). The parties agree that there is no practical difference between the language of the two provisions.

On January 1, 1990, the MCCA was repealed by the Medicare Catastrophic Coverage Repeal Act of 1989. The Company then hired the management consulting firm of Towers, Perrin, Forster & Crosby to determine whether the repeal of the MCCA would result in any future increased costs to the Company. The consulting firm concluded that the repeal shifted costs to the Company over the life of the Plan which costs Medicare would have otherwise covered. *See* Affidavit of Gathers. Based upon this assessment, the Company announced in July of 1990 that, pursuant to § 7(H) of the settlement agreement and § 6.03(f) of the Plan, it would assess a supplemental premium to cover its increased costs due to the repeal of the MCCA. *See* Affidavit of Samuel Torrence, Vice President of Industrial Relations for the Company. The supplemental premium amounted to an increase of $3.00 per month in contributions assessed upon the retirees. *Id.*

Pursuant to the Plan's administrative appeal procedure, plaintiffs in November of 1990 challenged the imposition of the supplemental premium before the Pension Board. Under the Plan, the Pension Board has the "sole and absolute discretion", *inter alia*, to interpret the Plan's provisions and to resolve disputes arising thereunder.

The relevant section provides, in pertinent part, as follows:

> The Plan shall be administered by the Pension Board appointed by the Company. The Pension Board shall have such authority and perform such duties, consistent with the Plan, as may be determined from time to time by the Company. Without limiting the generality of the foregoing, the Pension Board shall have sole and absolute discretion to interpret where necessary the provisions of the Plan (including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan), to determine the rights and status under the Plan of Covered Persons or other individuals, to resolve questions or disputes arising under the Plan, and to make any determinations with respect to the benefits payable hereunder and the persons entitled thereto as may be necessary for the purposes of the Plan.
>
> . . . . .
>
> All decisions of the Pension Board as to the facts of any case, as to the interpretation of any provision of the Plan or its application to any case, and as to any other interpretive matter or other determination or question under the Plan shall be final and binding on all parties affected thereby, subject to the provisions of Article VII.

*Id.*, at § 10.01. Plaintiffs argued before the Pension Board that the assessment of the supplemental premium was incorrect under the language of § 6.03(f) of the Plan because the repeal of the MCCA either did not "reduce" existing Medicare benefits or did not result in "increased costs" to the Company for benefits which might be said to have been reduced.

In February of 1991, the Pension Board concluded that § 6.03(f) of the Plan authorized the Company's assessment of the supplemental premium. In a letter written on February 19, 1991 to counsel for plaintiffs, the Pension Board communicated its findings in this regard as follows:

> For the reasons set forth below, the Pension Board has concluded that the repeal of the Medicare Catastrophic Coverage Act of 1988 ("Act") on December 13, 1989 constituted "an increased cost of the Plan resulting from [a] reduction of [Medicare] benefits provided as of January 1, 1989 by Medicare ..." and that the supplemental premium of $3.00 per participant per month was properly assessed. A brief recitation of the relevant facts may best explain the Pension Board's rationale for this decision.
>
> . . . . . .
>
> On July 1, 1988, the Act was signed into law. The Act contained, among other things, provisions which increased Medicare catastrophic medical benefits. The additional benefits under Medicare would have reduced the cost of providing retiree health care benefits under employer-sponsored retiree health care plans, such as the Plan.
>
> The Medicare Catastrophic Coverage Repeal Act of 1989 which, as its name suggests, repealed the Act was signed into law on December 13, 1989. Between the time the Act was passed and the time it was later repealed, the provisions of the Plan were negotiated, drafted, and implemented. The cost reductions that the Act would have conferred upon the Plan were considered.
>
> As stated above, the Pension Board concluded that the failure of the Act to deliver the expected cost reductions was a "reduction of benefits provided as of January 1, 1989 by Medicare" since those cost reductions were a part of the Medicare law on January 1, 1989. Consequently, such increased cost could be passed on to Plan participants through supplemental premiums contemplated by Section 6.03(f) of the Plan.

Exhibit F to Affidavit of Torrence. Plaintiffs appealed this decision but the Pension Board reaffirmed its position in July of 1991.

The latter determination led plaintiffs to file the instant cause. In Count One of the amended complaint, plaintiffs allege that the assessment of the supplemental premium amounts to a willful violation of the Plan actionable pursuant to ERISA's civil

enforcement section, 29 U.S.C. § 1132(a)(1)(B) and (a)(3). Under Count Two, plaintiffs charge that the assessment of the supplemental premium also places the Company in breach of the settlement agreement. Finally, in the third count plaintiffs maintain that the assessment of the premium and the subsequent decisions by the Pension Board amount to breaches of defendants' fiduciary duties in violation of 29 U.S.C. § 1104(a), which breach is actionable pursuant to 29 U.S.C. § 1132(a)(2).

## II. ANALYSIS

### A. Introduction and Statement of Issues

■ When the court is presented with motions for summary judgment, the ultimate burden ordinarily lies with the non-moving party to demonstrate the existence of a genuine issue of material fact with respect to issues on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The majority of the issues placed before the court by the motions, however, are purely legal in nature. The posture of this case therefore does not lend itself to the usual analysis undertaken pursuant to Rule 56. Where the court's decision on a particular issue does however depend upon the resolution of issues which are factual, as opposed to purely legal, in nature, this opinion will so indicate and the court will undertake to frame its analysis in terms consistent with those set forth in the cases cited above and their progeny.

In their motion for summary judgment, defendants first contend that Count Two of the amended complaint is preempted by ERISA pursuant to 29 U.S.C. § 1144(a). Plaintiffs oppose this contention in both their motion for summary judgment and in their response memorandum. In so doing, plaintiffs also submit that the Company's assessment of the supplemental premium amounts to a breach of § 7(H) of the settlement agreement.

In addressing the claim made under the first count, the parties in their motions initially disagree as to the proper standard of review to apply to the Pension Board's decision upholding the Company's assessment. According to defendants, the Pension Board's determination can only be overturned by the court if it was arbitrary and capricious because § 10.01 of the Plan gives it absolute discretion to decide issues of this nature and to interpret the Plan's language. Plaintiffs counter by arguing that a *de novo*, rather than an "arbitrary and capricious," standard applies to the Pension Board's decision and that the decision was contrary to the express language of § 6.03(f) of the Plan. Plaintiffs and defendants include alternative arguments as to this portion of their analysis: plaintiffs contend that, even if the court does not review the Pension Board's determination *de novo*, the decision was nonetheless arbitrary and capricious; defendants, on the other hand, urge the court to uphold the Pension Board's decision on the merits even under a *de novo* review.

The parties, finally, interpret defendants' actions in differing manners with regard to plaintiffs' claim for breach of fiduciary duty. According to plaintiffs, the assessment of the supplemental premium and the subsequent disagreement with plaintiffs as to the Plan's language constitute a breach of defendants' fiduciary duties under the Plan. Contrariwise, defendants maintain that their decisions since the settlement of the *Kennedy* case have fully comported with their obligations as fiduciaries under ERISA.

With the foregoing framework in mind, the court will now address each of the issues just summarized in turn.

### B. Count Two—ERISA Preemption

■ The ERISA preemption doctrine is embodied in 29 U.S.C. § 1144(a), which provides as follows:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State

laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

According to defendants, plaintiffs' claim for breach of the settlement agreement "relates to" the Plan and is therefore preempted by this section. Plaintiffs maintain that, inasmuch as the settlement agreement was entered into and executed prior to the implementation of the Plan, it cannot be said to relate to the latter document within the meaning of the preemption statute.

■ Before the parties' respective arguments are addressed, it is well to briefly discuss the ERISA preemption doctrine and the meaning of the term "relate to" contained in § 1144(a). The Supreme Court has recently emphasized that the words "relate to" in this section are to be read in extremely broad fashion. *See Ingersoll-Rand Company v. McClendon*, 498 U.S. 133, 111 S.Ct. 478; 112 L.Ed.2d 474 (1990); *FMC Corporation v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). The Sixth Circuit has discussed these two cases in the following manner:

> The Supreme Court in *FMC* discusses in detail 29 U.S.C. § 1144(a) (1991), ERISA's "pre-emption clause." This clause provides that all state law claims which "relate to" employee benefit plans are preempted. The *FMC* Court reaffirmed that this clause "is conspicuous in its breadth." 111 S.Ct. at 407. The Court also reiterated its finding in *Shaw v. Delta Airlines*, 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983), that Congress used the words "relate to" in this provision "in their broad sense." *Id.* [498 U.S. at ——, 111 S.Ct.] at 408. *Ingersoll-Rand*, [498 U.S. at ——] 111 S.Ct. at 478, demonstrates a similarly expansive reading of ERISA and the Court's holding that the plaintiffs' state law claim was preempted by ERISA and the Court's holding that the plaintiffs' state law claim was preempted by ERISA rests on analysis of the preemption clause. The Supreme Court in *In-*

*gersoll-Rand* found that a claim for wrongful termination was preempted by ERISA because the inquiry for this cause of action would be dependent upon—"relate to"—the existence of an ERISA plan. *Id.* [at ——, 111 S.Ct.] at 483. The claim was based on an allegation that the employer fired the plaintiff as a way to avoid contributing to the plaintiff's pension fund. *Ingersoll-Rand* and *FMC* both emphasize, as well, the larger policy rationales for a broad interpretation of ERISA's preemptive powers and the importance of avoiding conflicting state rules on ERISA-related matters. *Ingersoll Rand*, [498 U.S. at ——] 111 S.Ct. at 483; *FMC*, [498 U.S. at ——] 111 S.Ct. at 408.

*International Resources, Inc. v. New York Life Insurance Company*, 950 F.2d 294, 298-99 (6th Cir.1991). *See also Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1275-76 (6th Cir.1991). Pursuant to this reasoning, a state law claim is preempted if it in any way relates to, has reference to, or is connected to an ERISA plan even in an indirect sense. *Ingersoll-Rand*, 498 U.S. at ——, 111 S.Ct. at 483, 112 L.Ed.2d at 484, citing *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987).

In the case at bar, it is undisputed that the Plan, including § 6.03(f), was implemented pursuant to the settlement reached in the *Kennedy* case, of which the settlement agreement was a part. If the phrase "relate to" is construed in its broadest sense, then the court must conclude that plaintiff's claim for breach of the settlement agreement relates or is connected to the Plan. This conclusion is buttressed by the fact that, not only is the language of the subject provisions in the settlement agreement and in the Plan substantially identical, but all parties intended that the Plan be the direct product of the settlement negotiations. It is difficult to comprehend a better textbook illustration of the phrase "relate to" than that which has been presented in this case.

In attempting to escape this conclusion, plaintiffs rely upon the fact that the Plan was not yet in existence when the settlement agreement was entered, there being approximately one month's time separating the execution of the two documents. According to plaintiffs, their claim for breach of the settlement agreement does not relate to the Plan because it effectively arose when the agreement was reached, at which time there was no Plan in existence to which the settlement agreement could be said to relate. Plaintiffs' argument in this regard is twofold. First, they rely on *Perry v. P\*i\*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir.1989), *cert. denied* 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990), for the contention that the ERISA preemption doctrine only applies once a benefit plan is in existence. Second, plaintiffs maintain that to apply the doctrine in this case "would preclude the settlement of ERISA cases, because any agreement reached would be merely illusory. The Company could simply go ahead and draft a conflicting plan document [subsequent to settlement] and then thumb its nose by hiding behind the preemption doctrine." Plaintiffs' Response Memorandum at 6. Plaintiffs argue, in essence, that to apply the preemption doctrine under the circumstances at hand would effectively leave them without a remedy and would dissuade plan participants such as themselves from ever settling ERISA cases in the future.

There are several shortcomings to plaintiffs' arguments. First, in a situation such as that described by plaintiffs—*viz.*, where the defendant company attempts to "hide" behind the preemption doctrine by drafting an ERISA plan document which conflicts with a prior settlement agreement—the ERISA claimant would have a cause of action for breach of fiduciary duty. Pursuant to this duty, a fiduciary[2] must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... with the care, skill, prudence, and diligence" of a reasonably pru-

dent person under like circumstances. 29 U.S.C. § 1104(a). Certainly, the rights and duties created by ERISA are not as incomplete as plaintiffs suggest.

Second, an examination of *Perry* establishes that the reasoning therein does not strengthen plaintiffs' position. In *Perry*, employees who were plan participants brought a state law action against their employer for fraudulent inducement[3] in obtaining their participation in an ERISA plan. The defendant employer argued that this claim was preempted by ERISA and must for that reason be dismissed. The district court denied the motion to dismiss. In affirming the district court's decision that there is no ERISA preemption with respect to the employees' claims for fraud, misrepresentation, and promissory estoppel, the Sixth Circuit held that "preemption should apply to a state law claim only if Congress has provided a remedy for the wrong or wrongs asserted." *Id.*, 872 F.2d at 162, following *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir. 1981), *cert. denied* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384. The court was "uncertain whether 29 U.S.C. § 1132 provides, under the circumstances of the case, an adequate remedy to redress the wrongs claimed, specifically, rescission and refund of wage reductions," and for this reason affirmed the district court's ruling that there was no ERISA preemption with respect to the fraud, misrepresentation, and promissory estoppel claims. Pertinent to the court's inquiry and ultimate "uncertainty," *inter alia*, was the fact that the asserted misconduct occurred before the employees became plan participants and before the plan itself was even in effect. *Id.*, 872 F.2d at 161–62.

The undisputed facts in the case at bar are readily distinguishable and suggest that the court here conclude that ERISA does provide a remedy for plaintiffs herein. The alleged misconduct occurred subsequent to the Plan's enactment and while

---

2. The Company admits that it is a fiduciary with respect to the Plan. *See* Answer at ¶ 37.

3. The employees specifically alleged that their participation was procured through fraud, coercion, misrepresentation, and promissory estoppel.

plaintiffs were participants therein. Unlike the employees in *Perry*, who sought rescission of the plan itself, plaintiffs in the case at bar seek to invoke their rights *as plan participants and beneficiaries*. In this regard, it must be noted that, even when the settlement agreement was reached, plaintiffs had already been plan participants for several years. The settlement agreement was the result of litigation specifically concerning an ERISA plan and itself resulted in such a plan, *i.e.*, the Plan in question in this case. The settlement agreement is therefore inextricably intertwined with an ERISA plan past, present, and future, and with the relationship between ERISA entities. In such a situation, we cannot but conclude that ERISA provides the remedy—indeed the exclusive remedy—with regard to disputes concerning the settlement agreement. Due to the fact that the settlement agreement owes its existence to a dispute over an ERISA plan and itself resulted in the subject Plan, any action by plaintiffs to enforce their rights under the terms of the settlement agreement must be considered an action to enforce their rights under the Plan, pursuant to 29 U.S.C. § 1132(a). This is the exclusive remedy available to plaintiffs. *See International Resources*, 950 F.2d at 298 ("where rights are guaranteed by ERISA, the remedy for such rights under ERISA is exclusive").

The court's conclusion is further buttressed by two especially pertinent cases of note, *see Van Camp v. AT & T Information Systems*, 963 F.2d 119 (6th Cir.1992); *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550 (6th Cir.1987). In *Neusser*, the court established three factors for determining whether a state law is preempted by ERISA. In *Van Camp*, the Sixth Circuit summarized these factors as they pertain to state law causes of action as follows:

> In *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550 (6th Cir.1987), we set out three factors for consideration when determining whether a state-law claim falls outside of ERISA's broad preemption. As *Neusser* explains, "the factors ... are not exhaustive and ... no single factor is dispositive." *Id.* at 556. Nevertheless, they do provide some guidance as they reflect the goal Congress sought to achieve when it enacted the preemption clauses of ERISA—" 'reservation to Federal authority the sole power to regulate the field of employee benefit plans.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 [107 S.Ct. 1549, 1552, 95 L.Ed.2d 39] (1987) (quoting 120 Cong.Rec. 29197 (1974)).

> One factor to consider is whether the claim arises under a law that "represents a traditional exercise of state authority." *Id.* at 555. *See Shaw*, 463 U.S. at 101 [103 S.Ct. at 2902]. A second factor is whether invocation of the state law will affect " 'relations among the principal ERISA entities.' " *Neusser*, 810 F.2d at 556 (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters.*, 793 F.2d 1456, 1467 (5th Cir.1986), *cert. denied*, 479 U.S. 1089 [107 S.Ct. 1298, 94 L.Ed.2d 154] (1987)). Finally, the court may consider "the incidental nature of any possible effect of state law on an ERISA plan." *Id.*

*Id.*, at 122–23.

In *Van Camp*, the plaintiff employee was reassigned from Michigan to New Jersey by the defendant employer and was faced with either retirement or demotion due to his contention that he could not travel to the new position. The employee chose retirement under an enhanced ERISA pension plan, acknowledging by agreement that he did so voluntarily and irrevocably. He then filed a state law age and sex discrimination claim against the employer in state court, and the employer removed the case to federal court on the ground that the discrimination claims were related to the enhanced pension plan. The employee filed a motion to remand and, after he refused to amend his complaint to allege an ERISA cause of action, the district court denied his motion to remand and dismissed the case. The district court concluded that, inasmuch as the complaint raised the issue of whether the employee retired voluntarily, it amounted to a chal-

lenge to the pension plan's validity and therefore implicated ERISA.

On appeal, the Sixth Circuit initially noted that the complaint did not set forth a claim for benefits and did not "otherwise seek to enforce a right expressly provided under ERISA." *Id.*, at 122. However, the court nonetheless found preemption under the reasoning of *Neusser.* While recognizing that the state sex and age discrimination laws invoked represent a traditional exercise of state authority, *id.* at 122, the court concluded that the second and third *Neusser* factors favor preemption. *Id.* at 122–23. With respect to the second factor, the court reasoned as follows:

> Careful consideration of the second factor of the *Neusser* tests leads us to the conclusion that Van Camp's claims directly affect the status of AT & T as employer and Van Camp as beneficiary in an ERISA plan. Although Van Camp points out that he does not now seek reinstatement, his state-law claims are inconsistent with the retirement agreement under which he currently receives pension benefits. When Van Camp retired, he signed an agreement acknowledging that his decision to receive benefits under the enhanced pension plan was irrevocable and stating that he voluntarily retired. The effect of this agreement, one which provides that Van Camp is a voluntary retiree entitled to benefits under the ERISA plan, is the fulcrum on which resolution of this dispute turns. If Van Camp is entitled to recover on the theory that, as he claims, his retirement was forced by AT & T's age and sex discrimination and, therefore, was not voluntary, a court first would have to rule on the validity of the retirement agreement. Such a determination could be made only with reference to ERISA and would affect the existing benefit plan and the relations between Van Camp and AT & T as "principal ERISA entities." *See Neusser*, 810 F.2d at 556.

*Id.*

In the case at bar, we must similarly conclude that plaintiffs' claim for breach of the settlement agreement affects "relations among the principal ERISA entities;" *i.e.*, the Company and plaintiffs. As was the case with the retirement agreement in *Van Camp*, the settlement agreement here is the "fulcrum" on which resolution of the dispute under Count Two turns. However, due to the fact that the settlement agreement is, as we have held, inextricably intertwined with disputes over an ERISA plan and led to the implementation of the Plan in question, any determination as to the effect of the settlement agreement "could be made only with reference to ERISA and would affect the existing [Plan] and the relations between [plaintiffs] and [the Company] as 'principal ERISA entities.'" *Id.*

Finally, we must conclude, as did the court in *Van Camp*, that the state law of contract sought to be invoked in this case would have more than an incidental effect on the Plan. A finding that the Company breached the settlement agreement by assessing the supplemental premium would effectively amount to an implicit finding that the Company has violated the terms of the Plan.[4] Thus, a determination of the state law claim herein would have more than incidental effect on the Plan. *See Van Camp*, at 123.

Inasmuch as the final two *Neusser* factors favor application of the preemption doctrine under the facts of this case, the court is constrained to conclude as did the court in *Van Camp* that plaintiffs' claim for breach of the settlement agreement is preempted by ERISA, 29 U.S.C. § 1144(a), and must for this reason be dismissed. In so holding, we are of course not limited to the reasoning of *Neusser* and *Van Camp*, but also are guided by the discussions set forth in the relevant case law heretofore cited, *viz.*, *FMC Corp., Ingersoll–Rand, International Resources, Cromwell*, and *Perry*. With an analysis of the preemption doctrine now complete, the court turns next to the parties' argument regarding Count One of the amended complaint.

---

4. The parties will remember that the language of the settlement agreement and the Plan which form the basis of the respective state law and ERISA counts is identical for all practical purposes.

### C. Count One—the ERISA Claim and the Pension Board's Decision

In the first count of the complaint, plaintiffs allege that the Company's assessment of the supplemental premium violates § 6.03(f) of the Plan. Plaintiffs seek "to enforce [their] rights under the terms of the plan" pursuant to 29 U.S.C. § 1132(a)(1)(B) and to enjoin the assessment pursuant to § 1132(a)(3).

As has been discussed, plaintiffs and the Company disagree over the meaning of the terms "reduction in benefits" and "increased costs" in § 6.03(f) as applied to the facts of this cause. Plaintiffs' position can quite simply be stated as follows: pursuant to the MCCA, the Medicare Part B and prescription drug benefits were not to be provided until January 1, 1990 and January 1, 1991, respectively. Thus, the benefits were not yet being provided when the MCCA was repealed in December of 1989; with these benefits not yet in existence as of the date of the MCCA's repeal, it cannot be said that the repeal "reduced" the Part B and prescription drug benefits. With respect to the Part A benefits, plaintiffs initially admit that such were being provided as of the date the MCCA was repealed. They contend however that the reduction in Part A benefits did not result in "increased costs" to the Company because the Maintenance of Effort Provision of the MCCA required that any savings to the Company in 1989 resulting from the MCCA must be passed on to plaintiffs. In other words, according to plaintiffs, the repeal of the MCCA did not directly result in *present* increased costs associated with the reduction in Part A benefits because, as of the date of the repeal in 1989, the Company was not entitled to the savings which were otherwise conferred by the MCCA in this regard. Plaintiffs do not dispute the fact, however, that the Maintenance of Effort provision did *not* require the Company to pass these savings on to the Plan participants in 1990 and beyond.

As one can readily ascertain, plaintiffs proffer a narrow interpretation of the terms "reduction in benefits" and "increased costs." According to plaintiffs, an event cannot be said to reduce Medicare benefits *unless those benefits are being provided when the event occurs.* Likewise, maintain plaintiffs, a reduction in Medicare benefits does not cause the Company increased costs if, *at the time of the reduction,* the benefits which were being provided by Medicare did not save the Company any costs. Not surprisingly, the Company offers a much broader interpretation of the relevant language. The Company argues that an event can be said to "reduce benefits" if it prevents the bestowment of future benefits which have not yet been, but would otherwise be, provided. The Company also submits that a reduction in benefits can result in increased costs to the Company as long as the reduction has an appreciable effect on future, and not merely present, costs. The Pension Board agreed with the Company's construction of the Plan, concluding that, inasmuch as the Plan deals with lifetime benefits and the Company considered its future costs in undertaking its obligations thereunder and in settling the *Kennedy* suits, the Company was justified in interpreting § 6.03(f) in the manner stated.

■ The threshold issue before the court in assessing plaintiffs' claim under Count One concerns the proper standard of review to be applied to the Pension Board's decision. Defendants argue that, inasmuch as § 10.01 of the Plan grants the Pension Board absolute discretion to interpret the language of the Plan and to resolve disputes arising thereunder, the court should only overturn its decision if it finds such arbitrary and capricious. The rule of law invoked by defendants stems from the Supreme Court decision *Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There, borrowing from principles of trust law, the court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.,* 489 U.S. at 115, 109 S.Ct. at 956. Where the plan does grant such discretion, the administra-

tor's denial of benefits is to be overturned only if it is arbitrary and capricious. *Id.* The Court was careful to point out that its holding "is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations." *Id.*, 489 U.S. at 108, 109 S.Ct. at 953. The Court, in other words, expressed "no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." *Id.*

This caveat initially causes the court some amount of concern due to the fact that, although plaintiffs bring their claim under § 1132(a)(1)(B), it is not one challenging a denial of benefits. Even more troubling is the lack of case law in this circuit on the issue of whether the *Bruch* holding should apply to ERISA cases in which the claimants are not challenging the denial of benefits. Nonetheless, we find it appropriate to follow *Bruch* for two reasons: first, this action is brought pursuant to the remedial provision at issue in *Bruch,* § 1132(a)(1)(B); and second, an application of the reasoning in *Bruch* to the facts of this cause would be wholly consistent with the principles of trust law upon which *Bruch* is based. *See Bruch,* 489 U.S. at 111, 109 S.Ct. at 954, citing *Restatement (Second) of Trusts* § 187 (1959) ("where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion").

In attempting to defeat defendants' contention that an arbitrary and capricious, rather than a *de novo,* standard of review applies in this case, plaintiffs present three arguments. First, they maintain that the language of § 10.01 does not grant the administrator the discretion to resolve the type of claim at issue here. Even a cursory examination of § 10.01, however, reveals that the broad language of this provision does not limit the type of claim over which the Pension Board retains discretion to resolve. The Pension Board has, without exception, the authority to interpret the Plan's provisions, to determine the rights and status of participants, and to resolve disputes arising under the Plan. *Id.*

Moreover, § 10.01 provides that *all* decisions of the Pension Board shall be final and binding on all parties. *Id.* In light of the expansive language of this section of the Plan, it is impossible to conclude that the language thereof does not grant the Pension Board the discretion to act as it did in this case.

Plaintiffs next contend that the language of § 10.01 was not agreed to by the parties. As defendants point out, however, counsel for the respective parties jointly negotiated the Plan and, in particular, counsel for plaintiffs received a draft of the Plan in June of 1989 containing language similar to § 10.01. *See* Admission nos. 38, 39 and attached Exhibit 11 (Exhibit J to Defendants' Motion for Summary Judgment). There is no evidence, however, that counsel for plaintiffs ever objected to inclusion of § 10.01 in the Plan. In addition, during the final fairness hearing held before Judge Manos on July 7, 1989, neither plaintiffs or their counsel stated any objection to inclusion of § 10.01 in the Plan. *See, e.g.,* Deposition of Cairns at 69–70 and Deposition of Salisbury at 88–89.

Plaintiffs do not dispute that they made no objection to the inclusion of § 10.01 in the Plan, but attempt to overcome this shortcoming by arguing that "the Plan Document was not finalized by Defendants until after the Settlement Agreement was signed" and that "there was no need for Plaintiffs to object given the language ... that the parties had already agreed to." Plaintiffs' Response Memorandum at 8. The latter contention refers to the settlement agreement, which does not contain the discretionary language of § 10.01. Plaintiffs are contending, in essence, that although they were aware that § 10.01 would be included in the Plan, they did not believe that the Plan would have any binding or other effect on any party to the *Kennedy* litigation, but that only the settlement agreement would control. If plaintiffs truly believe this, then one must wonder why plaintiffs and their counsel took the pains to draft, execute, and implement the Plan at all which, under plaintiffs view, would only be deemed an illusory instru-

ment. The court simply finds this position unacceptable.

Plaintiffs' third and final contention in support of the proposition that § 10.01 is ineffective is derivative of the previous one. Plaintiffs maintain that § 10.01 is not binding upon the parties because it conflicts with the language of the settlement agreement and its attached summary plan description. According to plaintiffs, the absence of similar language in the settlement agreement and summary plan description amounts to a "conflict" with the language of § 10.01 in the Plan. Plaintiffs cite *Edwards v. State Farm Mutual Automobile Insurance Company*, 851 F.2d 134 (6th Cir.1988) and *Hale v. Life Insurance Company of North America*, 750 F.2d 547 (6th Cir.1984) in support of their position.

The decision in *Hale* is irrelevant to this case. There, the court held that, under Kentucky insurance law, a limitation on the payment of benefits in an insurance policy is inapplicable where the limitation is not contained in the insured's certificate of insurance (under Kentucky law, the insurer has "the absolute duty" to provide the insured a certificate of insurance outlining the policy's exclusions, 750 F.2d at 550). With respect to *Edwards*, the court there did hold that a statement in a summary ERISA plan is binding if the statement conflicts with those contained in the plan itself. *Id.*, 851 F.2d at 136, reiterating the holding of *Rhoton v. Central States, Southeast & Southwest*, 717 F.2d 988 (6th Cir.1983). In the case at bar, plaintiffs attempt to extend this holding by arguing that a summary plan "conflicts" with the language of a plan if it does not contain the language in question.

Plaintiffs' theory is unpersuasive for several reasons. First, in *Edwards*, there existed language in *both* the summary and the plan which was in *actual* conflict; the summary, in fact, contained a material misrepresentation. Here, such is clearly not the case. Section 10.01 of the Plan does not "conflict" with any existing language in the summary. Plaintiffs' argument would be more convincing if the summary

stated that the Plan administrator would *not* possess the discretion described in the Plan, rather than remaining merely silent on the issue; this however is not the case.

Second, the plan participants in *Edwards* were only given a copy of the summary, not the plan, and thus were not put on notice either that the plan contained conflicting language or that it would be construed in the manner proffered by the employer. *Id.*, 851 F.2d at 136. *See also Rhoton*, 717 F.2d at 992. In the case at bar, as has been mentioned, plaintiffs and their counsel were fully aware of the inclusion of § 10.01 in the Plan and so cannot now claim surprise or misrepresentation from the Company's reliance on that language as did the plaintiffs in *Edwards* and *Rhoton*.

Finally, we find that, when the facts of this cause are fully examined, the summary plan description and the Plan are not in any event inconsistent in the manner suggested by plaintiffs. As the Company points out, the law in this circuit prior to the *Bruch* decision was that *all* decisions made by the plan administrator with respect to ambiguous plan provisions and disputes arising thereunder were reviewed under the "arbitrary and capricious" standard, regardless of whether the plan in question granted discretionary authority to so act. *See Anderson v. Great West Life Assurance Company*, 942 F.2d 392, 394 (6th Cir.1991), citing *Daniel v. Eaton*, 839 F.2d 263 (6th Cir.1988), *cert. denied* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1989) and *Cook v. Pension Plan for Salaried Employees of Cyclops Corporation*, 801 F.2d 865 (6th Cir.1986). Thus, the absence of language similar to § 10.01 in the prior plans and in the settlement agreement and summary plan description is understandable; there was simply no need to include such language. When the *Bruch* holding became known, however, it was necessary to insert the language of § 10.01 so that the same standard of review would apply to Pension Board decisions under the Plan as applied prior to *Bruch*.[5] There is, in sum, no actu-

---

5. We recognize that the *Bruch* opinion was de-

cided on February 21, 1989, some four months

al conflict between the summary plan description and the Plan within the meaning of *Edwards.*[6]

■ Based upon the foregoing reasoning, we conclude that § 10.01 of the Plan is valid and controlling in this case. We also hold that its broad language gives the Pension Board the discretion to resolve disputes of the type at issue here. The scope of the grant of discretion in the Plan, in other words, covers the area of concern at issue here and entitles the Pension Board's decision to deference. See *Anderson,* 942 F.2d at 395 ("A plan administrator has exactly the amount and type of discretion granted by the plan, no more, and no less"). It is thus incumbent upon the court to determine whether the decision of the Pension Board is arbitrary and capricious.

In order to properly determine this we must, of course, set forth the parameters which are to guide the court's analysis in utilizing this standard of review. These parameters have recently been explained as follows:

■ As the Court explained in *Firestone:*

> ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions, "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts."

> *Firestone,* 489 U.S. at 110, 109 S.Ct. at 954 (citations omitted). Under trust law, a plan may give a trustee the

power to construe disputed terms, and in such circumstances the trustee's interpretation, if reasonable, will not be disturbed. *Id.* at 111, 109 S.Ct. at 954. As this court has explained: " 'Where both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control.' " *Cook v. Pension Plan for Salaried Employees,* 801 F.2d 865, 870 (6th Cir. 1986) (quoting *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 601 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983)). *Wells v. United States Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1248 (6th Cir.1991). The Pension Board's decision must be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of America Health and Retirement Funds,* 929 F.2d 1140, 1144 (6th Cir.1991). Further, "[w]ithout a showing of internal inconsistency or bad faith or some other ground for calling the [administrator's] determination into question, the arbitrary and capricious standard demands affirmance." *Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 695 (6th Cir. 1989), *cert. denied* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990).

The court initially notes that the language of § 6.03(f) being susceptible of ei-

---

prior to the execution of the settlement agreement in this case. The Company's position is that, at the time the settlement agreement and summary plan description were drafted, the parties were unaware of the substantive change in law imposed by *Bruch* and therefore saw no need to add language to the existing ERISA plan with regard to the Pension Board's authority to settle disputes. When the *Bruch* decision became known, however, the Company was compelled to include § 10.01 so that the Pension Board would have the same discretionary authority to resolve disputes arising under the Plan as existed without this section prior to *Bruch. See* Motion for Summary Judgment at 27–28. Plaintiffs have offered no rebuttal to this explanation of the state of affairs regarding

§ 10.01 either in their motion for summary judgment or in their response memorandum.

**6.** While the court recognizes that the summary plan description provides that the Plan is "subject to" the settlement agreement, we do not believe that this alters the reasoning herein in any manner. That the Plan is "subject to" the settlement agreement might mean that the settlement agreement is the source of the Plan's existence. It could also contemplate that the terms of the settlement agreement control over conflicting provisions of the Plan. It most certainly does not, however, denote that any language in the Plan which is absent from the settlement agreement is for this reason alone rendered null and void.

ther interpretation proffered, is ambiguous. We find, further, that the Pension Board's interpretation of § 6.03(f) of the Plan is reasonable under the facts of this case. Under the Plan, the Company was obligating itself to provide *lifetime* benefits to *thousands* of retirees. It would therefore be logical, and indeed intelligently prudent, for one in the Company's position to anticipate · governmental action which would have the effect of either preventing benefits from accruing or increasing its costs at some time in the future. It is thus reasonable to construe "reduction in benefits" as covering both reductions in existing benefits and reductions in future benefits not yet being provided. It is also sensible to include future costs to the Company in providing *lifetime* benefits within the meaning of "increased costs." This is not to suggest that plaintiffs' proffered construction of these terms is unreasonable; our conclusion rather is that both interpretations are rational based upon the language itself but that the Pension Board's interpretation must be allowed to control.

This discussion makes it clear that the Pension Board's decision was the result of "a deliberate, principled reasoning process" and is supported by substantial evidence and for this reason is entitled to deference. *Baker, supra.* For instance, the Pension Board was presented with evidence that the Company based its settlement figures on cost projections over time due to the fact that the settlement obligated it to provide lifetime benefits to thousands of retirees; that Medicare was the primary payor under the Plan; that the Company took into account Medicare and, specifically, MCCA coverage in projecting its costs; that the MCCA was repealed; and that the Company hired a management consulting firm which actuarially determined that the repeal increased its costs. Further, plaintiffs have made no showing whatsoever that the Pension Board's decision was based upon any internal inconsistency or bad faith. For this reason also the decision of the Pension Board must be upheld. *Davis, supra.*

Plaintiffs final argument is that the Pension Board's decision is not entitled to deference because the Board operated under a conflict of interest. Apparently, plaintiffs are urging that, because the Pension Board at the time was comprised of six Company officials,[7] the Board was acting under an inherent conflict of interest in having to decide an issue which might adversely affect the Company financially. To be sure, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956. Borrowing from another circuit, our own has described the impact of potential conflicts of interest upon the arbitrary and capricious standard of review in the following manner:

> The eleventh circuit, in *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561 (11th Cir.1990), has pointed out the difficulty of integrating factors such as self-interest into the legal standard for review where an insurance company serves as the decisionmaking fiduciary for benefits that are paid out of the insurance company's assets rather than out of the assets of the employee benefit plan. Because an insurance company pays out to beneficiaries from its own assets rather than from the assets of a trust, its fiduciary role lies in perpetual conflict with its profitmaking role as a business, and the conflict of interest is substantial. *Id.* at 1561–62. The Court in *Brown* held that the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest. *Id.* at 1563.

*Miller v. Metropolitan Life Insurance Company,* 925 F.2d 979, 984 (6th Cir.1991). More recently, the Circuit has announced that a complete identity between the fiduciary/administrator and the employer pres-

---

7. *See* Affidavit of Torrence at ¶ 7. ·

ents "the prototypical situation in which a conflict of interest must be weighed." *Callahan v. Rouge Steel Company*, 941 F.2d 456, 459 (6th Cir.1991).

■ The court finds that, while the fact that the Pension Board was comprised of Company officials lends support to the contention that there was some threshold conflict of interest, the decision reached by the Pension was nonetheless reasonable even factoring in this potential conflict. In this regard, it must be noted that there is no evidence whatsoever that the asserted conflict of interest, assuming such existed, had any effect on the Pension Board's decision at all. To the contrary, plaintiff Cairns, for instance, testified that he had no basis upon which to challenge the motivation or thinking of the Pension Board members in this case. Cairns Deposition at 116. In addition, plaintiff Salisbury testified that he has no personal knowledge of facts which might indicate that the members of the Pension Board were improperly biased in favor of the Company. Salisbury Deposition at 141. Salisbury opined only that the Pension Board decided as it did in order to save the Company money due to "the pressure of everyday corporate life." *Id.* In short, there is no evidentiary basis upon which to conclude that the members of the Pension Board were improperly motivated by a conflict of interest, other than the fact that they are company officials. This, we believe, is insufficient to create a genuine issue of fact on the question, especially in light of the fact that the Pension Board's interpretation of § 6.03(f) is rational under the circumstances of this case and no evidence reveals that it was tainted by bad faith or any internal inconsistency.[8] For all of the reasons heretofore stated, then,

the court finds that the Pension Board's decision in upholding the Company's assessment of the supplemental premium under § 6.03(f) of the Plan was not arbitrary and capricious. We therefore decline to overrule that decision and now proceed to an analysis of plaintiffs' final claim, that for breach of fiduciary duty.[9]

### D. Count Three—Breach of Fiduciary Duty

■ In the third count of their complaint, plaintiffs allege that the Company in assessing the supplemental premium and the Pension Board in upholding that assessment breached their fiduciary duties as Plan administrators. Plaintiffs invoke 29 U.S.C. § 1104(a), which describes these duties as follows:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries;

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

---

8. Rather than rebut the testimony proffered by defendants with direct evidence from the record, plaintiffs urge the court to ignore the portions of the depositions cited by defendants, asserting that they are "pulled out of context." Response Memorandum at 10 n. 4. A review of the testimony surrounding the cited testimony does not, however, support this contention. In any event, the court declines plaintiffs' invitation to peruse the hundreds of pages of depositions filed in this case in order to locate triable issues of fact. Under the "new era" summary judgment guidelines set forth by *Celotex*,

*Anderson*, and *Matsushita*, "the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Company*, 886 F.2d 1472, 1479–80 (6th Cir.1989).

9. Our analysis should also make it clear that, considering nothing but the evidence which was placed before the Pension Board, the Board's decision should be upheld even under a *de novo* review. *See Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir.1990).

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

This claim is brought under the civil enforcement section, 29 U.S.C. § 1132(a)(2), which provides as follows:

A civil action may be brought—

.    .    .    .    .

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

.    .    .    .    .

Finally, § 1109 prescribes the availability of relief for violation of this duty in the following manner:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made thought use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

■ Plaintiffs' claim under Count Three cannot survive for two independent reasons. First, a fiduciary's actions in administering and interpreting an ERISA plan is reviewable under an arbitrary and capricious standard. *Flacche v. Sun Life Assurance Company of Canada (U.S.)*, 958 F.2d 730, 737 (6th Cir.1992); *Moore v. Reynolds Metals Company Retirement Program for Salaried Employees*, 740 F.2d 454, 457 (6th Cir.1984), *cert. denied* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). Pursuant to the court's foregoing analysis, which need not be repeated here, we find that defendants' actions in this case were not arbitrary and capricious as a matter of law. In addition, we would add

that plaintiffs' sole support for their breach of fiduciary duty claim is their contention that defendants' interpretation of the relevant Plan language is wrong. *See, e.g.*, Deposition of Cairns at 121; Deposition of Smith at 127–128. The law of this circuit, however, is that such a contention does not as a matter of law amount to evidence that defendants' interpretation of the language was arbitrary and capricious. *DeMarco v. C & L Masonry, Inc.*, 891 F.2d 1236, 1241 (6th Cir.1987).

Second, plaintiffs seek recovery only on their own behalf, not on behalf of the Plan, pursuant to § 1132(a)(2) and § 1109. Such a cause of action is unavailable, however, because § 1109 only allows recovery to inure to the ERISA plan, *not* to individual beneficiaries. Our circuit has recently commented that

suits under ERISA for breach of fiduciary duty arise under 29 U.S.C. § 1132(a)(2), which allows beneficiaries of a plan, ... to seek relief under 29 U.S.C. § 1109.

.    .    .    .    .

As the language regarding fiduciary duty suits in section 1109 makes clear, ERISA contemplates that breaches of fiduciary duties injure the plan, not individual beneficiaries, and any recovery thus goes to the plan. As the Supreme Court noted in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985):

A fair contextual reading of the statute makes it abundantly clear that [the] draftsmen [of § 1109] were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.

*Id.* at 142, 105 S.Ct. at 3090. We recently decided a case by expressly following *Russell* and declaring that "1109 authorizes relief only to the plan itself, not to individual beneficiaries." *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129, 1133 (6th Cir.1989). *See also Mehl v. Navistar Int'l Corp.*, 670 F.Supp. 239 (N.D.Ill.1987).

*Bryant v. International Fruit Product Company, Inc.,* 886 F.2d 132, 135 (6th Cir. 1989). In *Bryant,* the court upheld the denial of a claim for breach of fiduciary duty because the plaintiff participants only sought recovery on their own behalf, and did not seek a return of funds to the plan in question. *Id.* The complaint therefore failed to state a cause of action for breach of fiduciary duty under ERISA. *Id.* An identical conclusion must, of course, be reached in this case. The third count of the complaint is thus dismissed.

### III.  CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by plaintiffs (docket no. 43) is denied. The motion for summary judgment filed by defendants (docket no. 37) is granted. In addition, there are also pending two other motions filed by the parties to this cause: a motion for class certification filed by plaintiffs (docket no. 13) and a motion to strike jury demand filed by defendants (docket no. 44). These motions are rendered moot by the court's current ruling and so are denied as such. This cause is hereby terminated in its entirety.

IT IS SO ORDERED.