**Marshall H. ANDERSON,**
**Plaintiff–Appellant,**

v.

**The GREAT WEST LIFE ASSURANCE COMPANY, a foreign insurance corporation, Defendant–Appellee.**

**No. 90–1704.**

United States Court of Appeals,
Sixth Circuit.

Argued May 7, 1991.

Decided Aug. 21, 1991.

Dennis E. Whedon (argued and briefed), Jackson, Mich., for plaintiff-appellant.

Jacqueline I. Heath (argued and briefed), Richard J. Gianino, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for defendant-appellee.

Before KEITH and BOGGS, Circuit Judges, and WELLFORD, Senior Circuit Judge.

BOGGS, Circuit Judge.

Marshall H. Anderson worked for the Anderson Distributing Company, a wholesale distributor of beer, wine, and soft drinks. The company purchased a health benefits plan through the Michigan Beer and Wine Wholesaler's Association ("MBWWA"). The defendant, Great West,

is the underwriter of the MBWWA plan. Anderson claims that he is entitled to certain benefits, which Great West denies. Anderson filed this action to get those benefits. The district court entered judgment in favor of Great West, and Anderson has appealed. Because we conclude that the district court applied an incorrect legal standard in reviewing the plan's decision on Anderson's claim, we vacate and remand for further proceedings.

## I

In the fall of 1988, Anderson had a stroke. By December, he had recovered to the point that he could leave the hospital. He remained, however, unable fully to take care of himself. At that time, Anderson's doctor recommended home nursing care. Anderson, or rather his family, hired a company called "Helping Hands" to provide the needed care. The services provided by Helping Hands included, *inter alia*, giving Anderson feedings through his gastronomy tube, suctioning his throat for secretions, and giving him "chest percussion" to loosen phlegm in his chest.[1]

Helping Hands apparently has some registered nurses on staff, but it also makes use of "homemakers" and "home health aides." Although Anderson received some care from registered nurses, the bulk of his care came from home health aides employed by Helping Hands.[2] Home health aides are not officially certified by the state of Michigan or any other widely recognized certification or training program. It is unclear what credentials, if any, home health aides must have. The aides do, however, go through Helping Hands's in-house certification program. In that training program, they learn to monitor vital signs, provide skin care, and other unspecified tasks. One witness testified that there was "quite a list of things they need to do," though she did not elaborate on that list. Some of the home health aides get more specialized "in-service" training in the operation of oxygen equipment, feeding equipment, and the monitoring of I.V. sites. We are not told whether this "in-service" training is a formal course of study or consists of informal instruction or how (or even if) the home health aides are tested to ascertain if they have mastered the new skills.

## II

The MBWWA plan at issue here covers some nursing care. It is the extent of the coverage that is at issue. The policy lists "nursing care" under the heading "Covered Expenses":

> Nursing Care—Medical care of injury or sickness by a nurse who is not related to [the beneficiary] and who does not normally reside in [the beneficiary's] home. For purposes of this provision, "nurse" shall mean only a registered graduate nurse, or a practical nurse who is either licensed under the laws of the State in which he or she resides or is registered by an organization operated with the approval of the medical profession.

Great West contends that home health aides do not fall within this definition, while Anderson says that they do. Anderson does not argue that the home health aides are "registered graduate nurse[s]." Consequently, the only issue is whether they could qualify as "practical nurse[s]." Practical nurses get in the door one of two ways—either by being licensed by the state or by being "registered by an organization operated with the approval of the medical profession." Anderson doesn't try to claim that the home health aides are licensed by the state of Michigan either. Rather, he takes the second path, contending that the home health aides are "registered by an organization operated with the approval of the medical profession."

Anderson's argument is that the home health aides are registered by an organiza-

---

1. Anderson apparently had a respiratory ailment in the aftermath of his stroke.

2. At oral argument, Great West conceded that it had to pay for the care provided by doctors and registered nurses, and it made representations that it had done so. Anderson disputed this, claiming that Great West had not paid for any of his medical expenses. Although the parties seem to differ on this question, it is not properly before us on appeal.

tion, Helping Hands, that is operated with the approval of the medical profession. He points to deposition testimony from physicians who claim to have approved of Helping Hands. Great West suggests that Anderson's interpretation of the plan provisions is unreasonable. Great West argues that the purpose of this provisions is to limit nursing care to "skilled" or "professional" nursing care, and that allowing Anderson to rely on an in-house certification would undermine these purposes. Further, Great West argues that the phrase "organization operated with the approval of the medical profession" was meant to refer to a quasi-official sanctioning body (especially in states with no formal LPN designation), not to a private corporation like Helping Hands.

The district court did not decide which of the two interpretations it ought to adopt. Instead, the court held that both interpretations of the contract were reasonable, but that the plan gave Great West the discretionary authority to interpret the relevant portions of the plan. The portion of the plan on which the district court relies reads as follows:

> Great West shall have the right to determine the amount of the benefits to which any Participant may become entitled under the Plan. The determination of benefits payable shall be made in the same manner as such determination would be made under the provision of the Policy in the absence of this Agreement.

This provision is the only one governing the nature and extent of Great West's discretionary authority.

### III

Our review of the district court's decision turns initially on the question of whether the court applied the proper legal standard. All agree that the MBWWA is governed by ERISA. Anderson maintains that he was entitled to *de novo* review of Great West's interpretation of the plan provisions; Great West counters, arguing that its interpreta-

tion of plan provisions is reviewable only for arbitrariness or caprice.[3] The Supreme Court spoke to this issue two years ago in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *Firestone* sets out an analytical structure for analyzing whether an administrator has been granted discretionary authority that governs the outcome in this case.

We believe that the district court in this case underestimated the import of the *Firestone* decision. The district court did cite *Firestone,* but it did not discuss it in detail. In addition to *Firestone,* the district court relied on two pre-*Firestone* Sixth Circuit cases, *Daniel v. Eaton,* 839 F.2d 263 (6th Cir.1988), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1989), and *Cook v. Pension Plan for Salaried Employees of Cyclops Corporation,* 801 F.2d 865 (6th Cir.1986). Under the prevailing pre-*Firestone* approach in our circuit, any ambiguity in a plan triggered an administrator's discretion; the decision of the administrator was reviewed under the "arbitrary or capricious" standard. This approach is reflected in cases such as *Daniel* and *Cook,* and it is the approach that was applied by the district court in this case.

In *Firestone,* the Supreme Court unqualifiedly rejected this approach. As we have already recognized, the Court has made it abundantly clear that discretion is *not* the norm, and that, absent a grant of discretion, an administrator's decision will be reviewed *de novo. Firestone,* 489 U.S. at 112, 109 S.Ct. at 956. *See also Brown v. Ampco–Pittsburgh Corp.,* 876 F.2d 546, 549–50 (6th Cir.1989). As we explained in *Brown,* "The purposes of ERISA are to promote and protect the rights of employees and their beneficiaries in employee benefit plans. Absent a clear grant of discretion to the administrator, application of the highly deferential arbitrary and capricious standard of review does not promote these goals." *Id.* at 550 (citation omitted). In

---

3. Great West also argues, in the alternative, that the district court did, in fact, conduct a *de novo* review of its interpretation of the operative language. We believe it is abundantly clear that

the district court's ruling rested on the assumption that Great West's decision should be reviewed only under a deferential standard.

*Firestone,* our approach to reviewing the interpretation of plan provisions under ERISA was rejected and our pre-*Firestone* decisions have been overruled on this issue. Post-*Firestone,* two principles emerge.

■ First, discretion is the exception, not the rule. Unless the plan grants discretion, the court should review the actions of the administrator *de novo.* The Court explained that, as ERISA "abounds with the language and terminology of trust law," trust principles should govern, where applicable. *Firestone,* 489 U.S. at 110, 109 S.Ct. at 954. The Court then noted that, "[a]s they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation." 489 U.S. at 112, 109 S.Ct. at 955. Further, the Court reasoned, under the law as it stood prior to ERISA, employees received *de novo* review, and the Court concluded that it would be anomalous to read ERISA to give plan participants less rights than before. 489 U.S. at 112–13, 109 S.Ct. at 955–56. Thus, "absent a clear grant of discretion," the court should have reviewed Anderson's claim *de novo. Brown,* 876 F.2d at 550.

Nonetheless, under *Firestone,* a plan administrator can be given discretionary authority. As the Court explained, "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Firestone,* 489 U.S. at 111, 109 S.Ct. at 954. In this case, however, the district court has failed properly to analyze the question of whether discretion has been granted by the plan provision.

■ Second, discretion is *not* an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others. A fiduciary or administrator does not have discretion with respect to all aspects of a plan simply because the administrator has discretion to interpret some provisions. Arguably, the plan provisions here give Great West a certain amount of discretion. Great West tries to use this fact to bootstrap itself into a position where it has discretion over all aspects of the plan. Firestone made a similar argument; it was rejected by the Supreme Court:

> Firestone concludes that an ERISA plan administrator, fiduciary, or trustee is empowered to exercise *all* his authority in a discretionary manner subject only to review for arbitrariness and caprice. But the provisions relied upon so heavily by Firestone do not characterize a fiduciary as one who exercises *entirely* discretionary authority or control. Rather, one is a fiduciary to the extent he exercises *any* discretionary authority or control.

489 U.S. at 113, 109 S.Ct. at 955 (citation omitted; emphasis in original). Accordingly, we reject the notion advanced by Great West that if the plan gave it any discretionary authority it gave it complete discretionary authority.

■ This second principle is a logical corollary of the first. *De novo* review is the "default rule." When a plan does wish to give discretion, however, it can still do so, but it must do so clearly. It follows from this principle that the area within which discretion can be exercised or the amount of discretion exercised depends on the scope of the grant. It is quite consistent with the teachings of *Firestone* that an administrator might be given discretion with respect to some decisions but not others, or given discretion on some decisions to be exercised within certain bounds. If so, the administrator's decisions on issues involving the exercise of that discretion are properly reviewed under a deferential standard, while all other decisions are properly reviewed *de novo.* A plan administrator has exactly the amount and type of discretion granted by the plan, no more, and no less. Accordingly, on remand, the district court must consider not only whether Great West has been given discretion, but also the exact contours of the discretionary authority, if any, given to Great West.

### IV

The district court ruled that the plan, as written, gave discretion to Great West. Unfortunately, in making this determina-

tion, the court applied the pre-*Firestone* approach. Accordingly, decision of the district court is VACATED and REMANDED for reconsideration under the correct legal standard.