Caylos **JOHNSON,** Plaintiff–Appellant,

v.

**EATON CORPORATION,**
Defendant–Appellee.

No. 91–2146.

United States Court of Appeals,
Sixth Circuit.

Argued May 15, 1992.

Decided Aug. 3, 1992.

Rehearing and Rehearing En Banc
Denied Sept. 21, 1992. --

Matthew A. Tyler, Meklir, Schreier, Nolish & Friedman, Southfield, Mich. (argued and briefed), for plaintiff-appellant.

Harold R. Oseff, Levin, Levin, Garvett & Dill, Southfield, Mich., Alan C. Harnisch (argued and briefed), Harnisch & Associates, Bingham Farms, Mich., for defendant-appellee.

Before: JONES and GUY, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Caylos Johnson appeals from the summary judgment granted to his former employer, Eaton Corporation, in his dispute over Eaton's offsetting Johnson's disability pension benefits by the workers' compensation benefits he receives. We conclude that the decision to make such offset is subject to review under the "arbitrary and capricious" standard and survives scrutiny under that test.

## I.

The facts are undisputed. Johnson was employed by Eaton for 20 years and was a participant in Eaton's pension plan. He retired from Eaton in December 1982 due to his disabling occupational lung disease. In 1983, he began receiving $395 per month in disability pension benefits under the plan.

Johnson then filed a petition for workers' compensation benefits and, in 1985, Eaton agreed to pay him approximately $1,100 per month in such benefits. Eaton issues checks directly to Johnson, drawing on its own bank account. As an employer in an industry whose workers are commonly afflicted by lung disease, Eaton is entitled to reimbursement from Michigan's Silicosis and Dust Disease Fund. Mich.Comp.Laws Ann. § 418.531. In order to spread the cost of certain occupational diseases, the fund exacts annual premiums, or "assessments," from all workers' compensation carriers and all private self-insured employers in the state—even those employers whose workers are not exposed to the risks of lung disease. By using these annual assessments to reimburse high-risk employers like Eaton, the fund "represents an attempt by the Legislature to compensate injured employees while protecting certain Michigan employers threatened by ruinous compensation claims." *Stottlemeyer v. General Motors Corp.*, 399 Mich. 605, 250 N.W.2d 486, 488 (1977).

The annual assessment levied on each self-insured employer like Eaton is calculated as a fraction—not to exceed 3 percent—of the total workers' compensation payments the employer made in the preceding year. Mich.Comp.Laws Ann. § 418.551(3). There is no dispute that Eaton's annual assessment historically has amounted to approximately $12,000. Nor is there any doubt that Eaton has indeed been reimbursed for the payments it has made to Johnson, in excess of the statutory "de-

ductible" of $12,500.[1] At oral argument, Eaton stated that reimbursement is sometimes delayed by as much as two years.

Shortly after Eaton began paying Johnson the $1,100 per month workers' compensation benefits, Eaton informed him that those benefits would completely offset his monthly $395 disability pension benefits, pursuant to Article IV § 2(a) of the Eaton pension plan. That section provides:

> In determining the monthly benefits payable under this Plan to any Retired or Vested Employee, a deduction shall be made ... from such benefits equivalent to all or any part of
>
> (1) Workers' Compensation benefits .. for which such Retired or Vested Employee becomes or could become eligible ... provided that *such deductions shall be made only to the extent that such benefits have been provided by premiums, taxes, or other payments made by or at the expense of the Corporation.*

(Emphasis added). Johnson challenged the denial of his disability pension benefits in an action under the Employment Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B). Based on the above language, the district court granted Eaton's motion for summary judgment.

## II.

We must first determine whether the pension administration committee's offset decision is to be scrutinized under the *de novo* or the more deferential "arbitrary and capricious" standard of review historically used in these cases. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

The issue thus becomes whether Eaton's pension administration committee enjoyed the requisite "discretion" to insulate its decision from *de novo* review. This circuit has interpreted *Firestone* to require that the plan "expressly" give discretionary authority to the administrator. *Perry v. Simplicity Engineering*, 900 F.2d 963, 965 (6th Cir.1990). *See also Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989) (the "grant of discretion to the administrator" must be "clear").

Johnson contends that the Eaton plan at issue invests the pension administration committee with no such discretion to determine eligibility or interpret plan language. The plan provides that the committee "shall have all such powers and authority as may be necessary to carry out the provisions of this Plan...." Johnson characterizes this verbiage as "merely boiler plate language which is not specific enough to meet the requirement of 'express discretionary authority' which *Firestone* calls for." (Plaintiff's Brief at 6). Nor does Johnson find discretionary authority in the committee's power to decide benefit appeals and its ability to "establish rules for the administration of this Plan ... and [to] determine the application of such rules." In Johnson's view, such provisions authorize the committee to perform only ministerial functions.

A survey of pension plan provisions at issue in other cases reveals that, while the question is close, the Eaton plan does endow the committee with authority to determine eligibility for benefits within the meaning of *Firestone*. To be sure, the declaration of discretionary authority is not as ringing as it was in *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 984 (6th Cir.1991) (plan stated that "disability" would be "determined on the basis of medical evidence satisfactory to the insurer"), nor as in *Bowman v. Firestone Tire & Rubber Co.*, 724 F.Supp. 493, 500 (N.D.Ohio 1989) ("Interpretation and application of this policy to a particular circum-

---

**1.** As Johnson's "injury date" was before July 1, 1985, Eaton was entitled to reimbursement only for benefits it paid in excess of $12,500. In other cases, this one-time deductible is set at $25,000 or the first 104 weeks of compensation, whichever is greater. Mich.Comp.Laws Ann. § 418.531.

stance shall be made by Firestone").[2] On the other hand, the plan is not so devoid of discretion-granting language as its counterpart appeared to be in *Ampco–Pittsburgh*, 876 F.2d at 550, which provided that eligibility for termination pay would be automatic upon the occurrence of a particular event. Further, while there is some support for the view that the grant of "authority to control and manage the operation and administration of the Plan" is not sufficient to insulate the case from *de novo* review, *Michael Reese Hosp. v. Solo Cup Employee Health Benefit Plan*, 899 F.2d 639, 641 (7th Cir.1990), other courts opting for the deferential standard have found significant, among other things, the type of rule-making authority granted here.[3]

The provisions regarding the administrative and rule-making authority are not the final word, however, on the Eaton committee's powers. That committee is also empowered to review the denial of claims, and its decision "shall constitute the final disposition under [the] Plan" of the claimant's case. Therefore, while the committee is not the first arbiter of a claimant's eligibility, the Eaton plan makes it the final one. In order to exercise this final authority, the committee members must certainly have been entrusted with the authority to exercise their judgment, or discretion, in interpreting and applying the eligibility provisions. *Compare Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 119 n. 5 (3d Cir.1990). Otherwise, the committee's review would be meaningless.

## III.

 Applying the deferential standard to the present case,[4] we cannot say that the decision to offset Johnson's disability pension benefits by the full amount of his workers' compensation benefits was arbi-

trary and capricious. As indicated above, the offset was accomplished pursuant to the Eaton plan text which states that pension benefits will be reduced by "Workers' Compensation benefits ... to the extent that such benefits have been provided by premiums, taxes, or other payments made by or at the expense of the Corporation." Johnson acknowledges that Eaton "is entitled to *some* offset" for the workers' compensation payments he receives. He argues, however, that Eaton should not be credited with the entirety of those payments since, under the Michigan statutory scheme, Eaton is reimbursed for making those payments to Johnson (after the first $12,500).

A similar claim was advanced by pension fund beneficiaries in *Wells v. United States Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244 (6th Cir.1991). That case involved the pension plan's policy of offsetting Kentucky Special Fund benefits against (noncontributory) pension benefits. The Kentucky Special Fund, similar in design to the Silicosis Fund at issue here and intended to benefit workers suffering from black lung disease, is sponsored by the state and financed by an excise tax on all employers doing business in that state. The pension fund in *Wells* stated that amounts paid to plan participants to compensate for occupational disease, if "paid directly or indirectly" by the employer, were to be deducted from the participants' pension payments. *Id.* at 1246. Another provision of the plan stated that this deduction "shall be limited to the amount, to the extent reasonably determinable, of such benefits attributable to employment with" the company. *Id.* at 1250.

The pension plan administrator interpreted this text to require that the pension payments be offset by the full amount of

---

**2.** Although the inclusion of this sort of language would have made our decision easier, "[t]he Court in *Firestone* surely did not suggest that 'discretionary authority' hinges on incantation of the word 'discretion' or any other 'magic word.'" *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1453 (D.C.Cir.1992).

**3.** *Richards v. United Mine Workers*, 895 F.2d 133, 135 (4th Cir.1990); *Gust v. Coleman Co.*,

740 F.Supp. 1544, 1551 (D.Kan.1990), *aff'd*, 936 F.2d 583 (10th Cir.1991); *Bowman*, 724 F.Supp. at 500.

**4.** The district judge applied the deferential standard but observed that his decision would have been the same if he had examined the committee's decision *de novo*.

the Kentucky Special Fund benefits its retirees received. The administrator theorized that those benefits were "indirectly" paid by United States Steel in the form of the special excise taxes and that the retirees had become entitled to them by virtue of their former employment at United States Steel. The retirees countered that only that (very small) portion of their weekly Special Fund payments attributable to United States Steel's excise-tax contributions could be used as an offset, rather than the full amount of those weekly payments.[5]

We rejected the plan administrator's interpretation as unreasonable. Only that small percentage of the retirees' payments which United States Steel paid to the fund via the excise tax (and which the fund then paid to the retirees) could be used as an offset under the plan's "indirect" payment provision. Since the remaining proportion of the Special Fund benefits made to United States Steel retirees was not paid, either directly or indirectly, by United States Steel, deducting the full amount from the pension payments contravened the plan language.

Although the *Wells* case is instructive as a model for our analysis, we find its conclusion inapposite to the present dispute. First, the Kentucky Special Fund benefits, unlike the Silicosis Disease Fund payments made to Johnson, were paid in two parts. Twenty-five percent of the total benefits awarded was paid *directly* to the retiree by United States Steel, and the remaining 75

percent was paid by the Special Fund. *Id.* at 1246. The *Wells* dispute involved only the offset of the 75 percent paid by Special Fund.[6] There was no suggestion that the pension plan was not entitled to offset the 25 percent which United States Steel paid directly to the retirees. In the present case, Eaton Corporation makes the entirety of the workers' compensation payments directly to Johnson. The company writes checks to Johnson from its own account; only later is it reimbursed by the Silicosis Fund. While such reimbursement was not a factor in *Wells*, since the plan language there focused solely on whether the company paid the benefits "directly or indirectly," the fact that Eaton Corporation writes checks directly to Johnson might well be deemed dispositive if governed by the rules of the *Wells* plan.

This difference in plan language is significant, and is the second reason why the *Wells* conclusion is not helpful to us. Again, the plan provision before us states that "deductions shall be made only to the extent that such benefits have been provided by premiums, taxes, or other payments made by or at the expense of the Corporation."[7] Under Eaton's interpretation of this provision, it may offset the entire amount of the workers' compensation benefits because it is *not* reimbursed for the annual $12,000 premium it pays to the fund; this premium is, therefore, paid at its own "expense."[8]

Central to Eaton's interpretation is its belief that the phrase "by or at the expense

---

**5.** The court concluded that the pertinent figures were available to the parties. According to the court, United States Steel could readily calculate its proportional contribution to its retirees' Special Fund benefits, "since [the company] knew what it was paying each year to the Kentucky Special Fund and knew what each retiree was receiving." *Wells*, 950 F.2d at 1246 n. 1. Although all parties in the present case know the amount of Eaton's annual premiums and the amount of the benefits Johnson receives, neither presumes to guess how much of those annual premiums—which are mingled with premiums from other Michigan employers and insurers—are manifest in Johnson's benefits (or, more specifically, in Eaton's periodic reimbursements for paying those benefits).

**6.** Again, it was held that the parties could readily determine how much of this 75 percent por-

tion was paid into the Special Fund by United States Steel.

**7.** It is interesting to note that the relevant text of the Eaton plan is a nearly verbatim copy of that involved in *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 507 n. 1, 101 S.Ct. 1895, 1898 n. 1, 68 L.Ed.2d 402 (1981). The *Alessi* Court did not need to interpret the full import of those provisions, however, since it considered only whether ERISA permitted this sort of integration clause and whether such a clause could be prohibited by state law.

**8.** Johnson concedes that "Eaton is entitled to *some* offset" for the Silicosis Fund payments he receives, but suggests no method by which to calculate how much of his monthly benefits (or of the periodic reimbursements the fund makes

of the Corporation" modifies only the term "premiums," rather than "such benefits." In contrast, by arguing the significance of Eaton's reimbursement for the benefits, Johnson impliedly suggests that "by or at the expense of" refers only to the phrase "such benefits." He argues that since Eaton is eventually repaid for the checks it writes to him (beyond the first $12,500), these benefits are not truly made at Eaton's "expense." Instead, as he puts it, the benefits he receives "are not, by and large, being *provided at* the expense of Defendant, but by the grace of the Michigan Legislature." (Plaintiff's Brief at 11) (emphasis added).

Johnson's version of the real dynamics at work reveals another implicit dispute. Eaton, in emphasizing that the *premiums* are paid at its own expense, necessarily engages in an expansive reading of the term "provided by." (Only those "benefits" "provided by" premiums or payments made at its expense may be deducted.) The "benefits"—which Eaton necessarily views as its *entitlement to reimbursement* for having issued checks directly to Johnson— are "provided by" Eaton's annual premiums in the sense that they are "attributable to" Eaton's mandated participation in the fund.[9] For his part, Johnson necessarily reads "provided by" narrowly, as he repeatedly reminds the court that all Michigan self-insured employers and workers' compensation carriers contribute to the fund. Since the money in the fund comes from so many sources, Johnson's theory goes, the benefits he receives, viewed from a post-reimbursement perspective, are not solely "provided by" the premiums which Eaton pays into the fund. Only a small (unspecified) fraction of his monthly bene-

fits are thus traceable to Eaton's premiums, according to Johnson. It is this implicitly narrow construction of the term "provided by," as well as his express reliance on the phrase "to the extent that," which inform Johnson's argument that Eaton is entitled only to "*some* offset" for the benefits he receives.

As is clear from *Wells*, once we have determined that the plan invests the administrator with the requisite discretionary authority, "this court may not overrule [the administrator's] interpretation of the Plan language unless the administrator's reading may be said to be arbitrary and capricious. That standard of review asks whether [such] interpretation of the Plan language is 'reasonable.'" *Wells*, 950 F.2d at 1249 (quoting *Firestone*, 489 U.S. at 111, 109 S.Ct. at 954).

Applying this standard, we determine that while the case is close, the interpretation offered by Eaton is reasonable. Indeed, the case is close precisely because both parties have submitted rational readings of this ambiguous text, which is clear only in indicating that a setoff of some sort is permitted. As we cannot say that Eaton's pension plan committee acted capriciously in deciding that the phrase "at the expense of" refers only to "premiums" rather than "benefits,"[10] nor in reading the phrase "provided by" broadly, we must allow its interpretation to stand. We note that this same conclusion was reached by the district court in *Horace v. Auto Specialties Mfg. Co.*, 663 F.Supp. 54 (W.D.Mich.1987), a pre-*Firestone* case involving the Michigan Silicosis Fund and an identical integration provision. The *Horace* court held that despite the employer's reimbursement for the benefits it paid to plaintiff, it was not unreasonable or capri-

to Eaton) is directly traceable to Eaton's annual $12,000 payment to the fund, to which all other self-insured Michigan employers and workers' compensation carriers similarly contribute.

**9.** This is also the way the district court analyzed the term "benefits." Recognizing that Johnson's benefit checks are actually issued by Eaton, the court went on to state, referring to the "provided by" language, that the "reimbursements ... result from [Eaton's] premiums." Johnson advances a somewhat similar reading of the term "benefits." In his view, "benefits" can be under-

stood only with the reimbursement notion in mind; since Eaton is reimbursed, he argues, the benefits are not ultimately made at Eaton's "expense."

**10.** As indicated above, Eaton's direct issuance of Johnson's monthly checks required both parties' interpretation of "benefits" to take into account the reimbursement concept—Eaton emphasizing the source of its entitlement to reimbursement and Johnson stressing just the simple fact of reimbursement.

cious for the plan administrator to offset plaintiff's pension payments by the entirety of those benefits on the basis of the employer's annual premiums. *Id.* at 56.

We also note that similarly ambiguous language, calling for deductions (from disability pension benefits) of amounts "for which the Company ... *is liable* pursuant to Worker's Compensation," was elsewhere held to have been reasonably read by the plan administrator to allow deductions for the full amount of the awards even though the employer was not strictly "liable" for the payments, but merely contributed to the fund from which the payments were made. *Gust v. Coleman Co.*, 740 F.Supp. 1544, 1552 (D.Kan.1990) (emphasis added), *aff'd*, 936 F.2d 583 (10th Cir.1991).[11] In reaching this decision, the *Gust* court made the critical observation that when the Supreme Court approved of such integration provisions in *Alessi*, it "spoke only of an employer's contribution to the other fund and did not require a dollar for dollar exchange of the employer's contribution and the corresponding reduction in pension payments." *Gust*, 740 F.Supp. at 1552.

AFFIRMED.

---

11. Another court, faced with this "liable for" terminology, concluded that the entire amount of the plaintiff's Workmen's Compensation award could be deducted from his pension payments even though the Kentucky Workmen's Compensation Board had ordered the company to pay only 25 percent of the award (while the state's special fund paid the rest). *Salyers v. Allied Corp.*, 642 F.Supp. 442 (E.D.Ky.1986).