**Russell WULF and Ronald Rentschler, Plaintiffs–Appellants,**

v.

**QUANTUM CHEMICAL CORPORATION; Quantum Employee Stock Ownership Plan for Hourly Represented Employees, Defendants–Appellees.**

No. 93–3061.

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1994.

Decided June 15, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 27, 1994.

James B. Robinson (argued and briefed), Kircher, Robinson, Cook, Newman & Welch, Cincinnati, OH, for plaintiffs-appellants.

David T. Croall (briefed), James K.L. Lawrence, Frost & Jacobs, Cincinnati, OH, and Cynthia P. Purvis (briefed) and John W. Purcell (argued), Baker & Daniels, Indianapolis, IN, for defendants-appellees.

Before: KENNEDY and MILBURN, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge, delivered the opinion of the court, in which MILBURN, Circuit Judge, joined.

KENNEDY, Circuit Judge (pp. 1378–1380), delivered a separate dissenting opinion.

LIVELY, Senior Circuit Judge.

This is an ERISA (Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.) case in which the district court granted summary judgment to the defendants upon concluding that the plaintiffs did not suffer a "termination of employment" when their employer sold the division where they worked. After a period of discovery, the parties filed cross-motions for summary judgment. The district court denied the plaintiffs' motion, granted that of the defendants, and dismissed the action.

## I.

The defendant Quantum Chemical Corporation sold its plant at St. Bernard, Ohio to Henkel Corporation on April 17, 1989, as part of the sale of its Emery Division. The plaintiffs were employed by Quantum at the St. Bernard plant at the time of the sale and were participants ("Members") in the Quantum Employee Stock Ownership Plan for Hourly Represented Employees (the Plan or ESOP). Section 7.01 of the Plan provides that "[u]pon a Member's termination of employment the Vested Portion of his Account shall be distributed as provided in this Article" (Article 7, "Distribution of Accounts"). Section 7.03 provides, as applicable here, for distribution of the vested portion to be made "as soon as administratively practicable following ... the Member's termination of employment." This section also provides that a terminated employee may elect "to have his distribution commence as of a Valuation Date coincident with or next following ... his termination of employment...." Although the Plan uses "termination of employment" throughout Article 7, that term is never defined.

The sales agreement required Henkel to offer employment to employees of the Emery Division. In addition, the sales agreement called for Henkel to cause either new or existing trusts funding employee benefit plans to accept transfers of assets and liabilities from all of Quantum's retirement plans, including the defendant Plan, attributable to employees accepting Henkel's offer of employment. After the sale, however, Henkel refused to accept the transfers of assets and liabilities of the Plan. Quantum subsequently amended Section 7.03 of the Plan on December 14, 1989, retroactively effective to April 15, 1989, to provide for the distribution of plan proceeds to plan participants in the event that Quantum, or a subsidiary of Quantum, sold substantially all of its assets and the plan participants continued employment with the purchaser.

The hourly employees at the St. Bernard plant were hired by Henkel and continued to perform the same duties at the same wages, in the same location and under the same supervisors. Quantum determined that no termination of employment occurred at the time of the sale and that the plaintiffs were entitled to distribution of their accounts in the Plan only by reason of the amendment.

Quantum elected to distribute the proceeds of the Plan in the latter part of 1989. In preparation for that distribution, application forms were distributed in October 1989 to

Emery Division employees rehired by Henkel. These forms gave the plan participants a choice: to retain their accounts in the Plan or have their account balances distributed in lump sum payment of cash or stock. The named plaintiffs elected a lump sum payment of their accounts in cash. Quantum made the requested distributions in December 1989. The dispute that resulted in this law suit is over the date on which the accounts' balances were valued. Quantum valued the accounts for distribution purposes on October 31, 1989, more than six months after the sale. The value of the accounts on April 17, 1989, the date of sale, was substantially higher. In fact, if the distribution had been valued on the date of sale, the amount distributed would have been $573,477 more than Quantum actually distributed in December.

## II.

The plaintiffs filed this ERISA action under 29 U.S.C. § 1132(a)(1)(B), which provides that a civil action may be brought by participants in a plan governed by ERISA "to recover benefits due [them] under the terms of the plan." The district court eventually certified the case as a class action on behalf of "those persons employed by Quantum Chemical Corporation at its Saint Bernard plant who were participants in its hourly employee ESOP plan immediately prior to April 17, 1989."

## A.

In their complaint, which named Quantum and the Plan as defendants, the plaintiffs alleged that the vested portions of their accounts should have been valued and distributed to them in April 1989. This claim was based on the contention that the sale of the Emery Division to Henkel resulted in a termination of their employment on April 17, 1989.

The defendants admitted that the plaintiffs were participants in the Plan until the date when their accounts were distributed to them, and that the plan was subject to ERISA. They denied that the plaintiffs' employment was terminated as of April 17, 1989, and denied any wrongdoing in valuing

the plaintiffs' accounts for distribution as of October 31, 1989.

## B.

As exhibits to their motion for summary judgment the plaintiffs filed copies of two communications from Quantum. Exhibit A was an undated letter on Quantum stationery addressed to "Dear Quantum Employee." The letter appears to have been sent to the employees in January 1988, as it referred to Quantum's 1987 earnings. The letter announced the company's decision to form the ESOP and stated that Quantum was contributing a profit sharing bonus in the form of Quantum stock to an account "in your name." The letter explained that the stock bonus awards depended on Quantum's success and were granted as an incentive for employees to continue efforts in the future that contributed to that success. Referring to distribution, the letter stated, "You receive the value of your account when you leave Quantum, if you have two years of service at that time."

Exhibit B, dated April 29, 1988, was a newsletter titled "Profit Sharing Stock Bonus Plan." It referred to the earlier announcement of creation of the ESOP and again described the Plan as "an incentive to continue the hard work and enthusiasm that have brought us this success." The document described in some detail how the bonus plan worked, how values of contributions were computed and the relationship between market value of Quantum stock, which funds the ESOP, and individual employee's accounts. In two places this communication used the same "when you leave Quantum" language found in the earlier letter. The plaintiffs argued at the summary judgment hearing that statements in the newsletter clearly advised that membership in the Plan depended on being employed by Quantum.

The plaintiffs also filed an affidavit in which they alleged that Quantum's personnel officer Richard Neff had told Emery Division employees prior to the sale to Henkel that their ESOP shares would be valued and distributed as of the last day of the month of the sale.

### C.

In support of their motion for summary judgment the defendants relied on the Plan itself, as amended, and documents exchanged between Quantum and Henkel in connection with the sale of the Emery Division. The defendants argued that the plaintiffs and similarly situated employees did not experience a termination of employment upon the sale of the Emery Division. This being so, the defendants continued, the Plan contained no authorization for distribution to the plaintiffs of the value of their ESOP accounts based upon sale of a division until Quantum amended the Plan to provide specifically for such a distribution.

Quantum asserted that the brief descriptions of the Plan and of participants' rights contained in the exhibits did not define or enlarge the rights of participants or the obligations of Quantum or the Plan administrator, a committee of three persons not affiliated with Quantum. They took the same position with respect to Neff's alleged statements, which he denied making when he gave his deposition. Quantum argued that it acted within its discretion in choosing the October 31, 1989, valuation date and that the plaintiffs and their class had no claim for damages based on the decline in value of Quantum stock between April and October.

### III.

In its order granting the defendants' motion for summary judgment, the district court agreed that the Plan did not require the defendants to distribute funds or value the plaintiffs' accounts as of the date of the sale to Henkel. The court stated that the transfer of a subsidiary or division in which employees retain the same job responsibilities and work for the same wages under the same supervisors does not effect a termination of employment. In order for the transfer to Henkel's payroll to qualify as a termination, the court stated, the employees would be required immediately after the sale either to assume new responsibilities with the new employer or actually to sever that employment relationship.

The district court also held that representations in the "summaries" circulated to the employees by Quantum were not binding interpretations of the term "termination of employment." The documents did not qualify as Summary Plan Descriptions (SPDs) required to be furnished to plan participants by 29 U.S.C. § 1022(a)(1) because they contained only a few of the items of information set forth in § 1022(b). The district court recognized that language in an SPD that conflicts with language of a plan will prevail over plan language, but held that the two documents in question did not qualify for this treatment. In addition, the court stated that the "imprecision of language" in the documents precluded a finding that the documents defined "termination of employment." Further, the court found that the plaintiffs had produced no evidence that they relied upon or changed their positions in any way based on Neff's alleged statements. Thus, any inconsistency between his oral representations and the language of the Plan would not bind Quantum under an estoppel theory.

### IV.

The district court did not indicate in its order what standard of review it applied in determining that the plaintiffs had not experienced a termination of employment.

### A.

For a number of years after the passage of ERISA, many courts, including this one, accorded deference to a plan administrator's decisions respecting claims for benefits, reviewing these decisions under an arbitrary and capricious standard. See *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987) and cases cited therein.

The Supreme Court has now mandated a different approach with respect to actions challenging benefit eligibility determinations brought under 29 U.S.C. § 1132(a)(1)(B), the statutory basis of the present action. The Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administra-

tor or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Thus, a reviewing court should first examine the plan to determine whether or not the required discretion has been given.

This court has read *Firestone v. Bruch* to hold that discretion is the exception, not the rule and that the arbitrary and capricious standard does not apply unless there is a *clear* grant of discretion to determine benefits or interpret the plan. *Anderson v. Great West Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir.1991). Furthermore, "discretion is *not* an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others.... A plan administrator has exactly the amount and type of discretion granted by the plan, no more, and no less." *Id.*

■ The defendants rely on § 8.07 of the Plan as granting discretion to the committee that functioned as administrator of the Quantum Plan sufficient to invoke an arbitrary and capricious standard in reviewing the committee's determinations in the present case. Section 8.07 reads as follows:

> 8.07 Establishment of Rules
>
> Subject to the limitations of the Plan, the Committee from time to time shall establish rules for the administration of the Plan and the transaction of its business. The determination of the Committee as to any disputed questions shall be conclusive.

This section is included in Article 8, "Administration of the Plan." Other articles and sections deal with valuation (§ 4.02), valuation date (§ 1.32) and distribution of accounts (Article 7). None of these provisions contains any discretionary language.

### B.

Applying the rules of construction enunciated in *Anderson v. Great West*, we conclude that the Plan does not clearly give the committee that degree of discretion required to invoke deference to the administrator's interpretation of "termination of employment." This being so, the district court should have, and we must, review the committee's determination to deny the plaintiffs' claim under a de novo standard, "applying trust principles." *Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir.1989). Using this standard a court "is bound by the provisions of the documents establishing an employee benefit plan 'without deferring to either party's interpretation.'" *Id.* (quoting *Firestone v. Bruch*, 489 U.S. at 112, 109 S.Ct. at 955).

We have carefully considered the defendants' arguments in favor of applying an arbitrary and capricious standard of review. We recognize that no incantation of the magic word "discretion" is necessary and that courts have held language such as "determination ... as to any dispirited questions shall be conclusive" to grant discretion sufficient to shield such determinations from de novo review. Nevertheless, each plan must be read in its entirety and language claimed to create the required degree of discretion must be examined in context. Bearing in mind that a grant of discretion is not "an all-or-nothing proposition," we conclude that § 8.07 is properly construed to mean that conclusiveness of the committee's determination is limited to disputes over the meaning and application of any rules it might establish pursuant to the first sentence of that section. Section 8.07 clearly deals with rules for administration of the Plan, not with interpretation of the language of the Plan. As *Anderson v. Great West* teaches, once an administrator is found to have a degree of discretion under a plan, the reviewing court must determine "the exact contours of the discretionary authority." 942 F.2d at 395. The placement of the reference to finality of the committee's determinations of disputed questions in the section granting authority to make rules does not indicate a clear grant of discretion to interpret the language of the Plan generally.

In *Johnson v. Eaton Corp.*, 970 F.2d 1569 (6th Cir.1992), the plan gave the administrator authority to establish rules for its administration and to determine applications of the rules. Although the court found that the plan did give sufficient discretion to invoke review under the arbitrary and capricious standard, the court did not rely principally on this rule-making authority. The plan in

that case also gave the administrator power to review denial of claims and provided that its decisions would constitute the "final disposition" of a claimant's case. *Id.* at 1572.

The United States Court of Appeals for the Eleventh Circuit recently reached the same conclusion we do here in construing a plan that gave the administrator "authority to control and manage the operation and administration of the Plan" and the authority to "promulgate such rules and regulations as deemed necessary and proper to interpret or administer the Plan." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir.1994). In holding that this language "falls short of the express grant of discretionary authority necessary to trigger the arbitrary and capricious standard of review," the court held that the grant of authority to promulgate rules and regulations is "merely a grant of administrative powers." *Id.* at 788–89.

It is clear to us that the provisions of § 8.07 amount to nothing more than a grant of authority to make rules for the administration of the Plan, with the provision that the committee's decision respecting any dispute as to the meaning or application of the rules is final. Section 8.07 does not clearly give the committee discretion to interpret the language of the Plan.

## V.

Having determined the proper standard, we begin our de novo review with the language of the Plan, the starting point for interpreting any written instrument.

## A.

Article 2 defines membership in the plan. Section 2.01 states that each full-time employee, subject to a minimum length of service not applicable here, is a "Member" of the Plan. "Employee" is defined in § 1.14 to mean "any person regularly employed by an Employer who receives regular stated compensation ... on an hourly wage basis ... and who is included in a unit covered by a collective bargaining agreement." "Employer" is defined in § 1.15 as "the Company" and certain subsidiaries and associated employers. Section 1.09 defines "Company" as follows:

> "Company" means Quantum Chemical Corporation, a Virginia corporation, or any successor by merger, consolidation, share exchange or similar type of corporate reorganization, or any entity that acquires the properties and assets of Quantum Chemical Corporation substantially as an entirety, provided such entity expressly assumes all of the obligations of the Quantum Chemical Corporation under the Plan.

Section 2.04 provides that membership terminates on a "Member's Severance Date unless the Member is entitled to benefits under the Plan, in which event his membership shall terminate when those benefits have been distributed to him in full." "Severance Date," in turn, is defined as "the date an Employee quits, retires, is discharged or dies...." § 1.26. Distribution of Accounts is covered in Article 7. Section 7.01, "Eligibility" provides in subsection (a) that distribution shall be made "[u]pon a Member's termination of employment," and § 7.03 requires distribution to be made "as soon as practicable following ... the Member's termination of employment."

## B.

The defendants argue that none of the provisions set out above, when applied to the facts of this case, leads to the conclusion that the plaintiffs were entitled to distributions valued as of April 1989 on the basis of the sale to Henkel. They contend that the sale did not terminate the plaintiffs' employment within the terms of the Plan. It was only when Quantum amended the Plan to provide for distribution in the event of sale of a division that these employees became eligible for distributions.

The plaintiffs maintain that they were no longer "Employees" of their "Employer" following the sale, and thus the sale terminated their employment within the meaning of the Plan. As terminated employees, they no longer qualified as "Members" of the Plan and were entitled to distributions based on a termination date of April 17, 1989. Section 1.32 defines "Valuation Date" as the last business day of each calendar month. Thus,

the plaintiffs argue, their shares should have been valued as of April 30, 1989. Because the plaintiffs were entitled to distributions under the Plan as it stood at the time of their termination, the amendment that referred to the sale of subsidiaries and gave the committee new discretion as to distribution of a member's account in such an event could not affect the plaintiffs' rights.

## VI.

### A.

The district court relied heavily upon tax cases in concluding that the plaintiffs were not terminated from employment. See *Miller v. United States,* 683 F.Supp. 166 (W.D. Tex.1987); *United States v. Haggart,* 410 F.2d 449 (8th Cir.1969); *United States v. Johnson,* 331 F.2d 943 (5th Cir.1964). The issue in all of those cases was the tax treatment that lump sum payments from an employer should receive. The employees were entitled to distributions when their employer sold the business or part of the business where they worked; entitlement was not an issue. The cases cited by the district court held that an employee who works at the same job in the same location, and at the same wages, but who receives a distribution from an employee benefit plan because of the change of employer, is subject, for tax purposes, to the "same desk rule." Under this rule the distribution is not entitled to preferential tax treatment because the employee has not been "separated from service."

Employers who establish an employee benefit plan subject to ERISA must be aware of tax consequences and must obtain Internal Revenue Service approval of certain features of the plan. This does not mean, however, that tax rulings concerned with treatment of an uncontested right to receive distributions are controlling, or even particularly helpful, in deciding the question of whether the employee is, in the first place, entitled under provisions of a plan to receive the distribution.

The district court also cited our decision in *Board of Education of Muhlenberg County v. United States,* 920 F.2d 370, 375–76 (6th Cir.1990). In *Muhlenberg Co.* we held that teachers who worked for separate school districts maintained "continuing current employment" for purposes of a Medicare tax exemption when their districts were consolidated. The court based its decision largely on the legislative history of an amendment to the Medicare Act which provided temporary relief from the Medicare tax at the time states and political subdivisions were first brought under the Act. The tax consequences to the employees from being brought under Medicare was not an issue in *Muhlenberg Co.;* it was the tax burden on the *employer* that was contested. We do not believe this case can be decided by applying generalized holdings and dicta in non-ERISA cases.

The district court also relied on two ERISA cases in determining that the plaintiffs were not terminated from employment. In *Harper v. R.H. Macy & Co., Inc.,* 920 F.2d 544 (8th Cir.1990), the court found that former employees of Macy's who were accepted immediately for employment by the purchaser of the stores in which they worked were not entitled to severance pay. The Macy benefit plan granted severance pay to employees who were "permanently terminated." After conducting a de novo review, the *Harper* court found that the purpose of the plan was to provide help to workers who lost their jobs during their period of unemployment. Since none of the plaintiffs were unemployed, they did not qualify for these benefits as "permanently terminated" employees.

The district court also cited *Wildbur v. The Atlantic Richfield Retirement Plan,* 765 F.Supp. 891 (W.D. La.1991), as support for its determination that the plaintiffs were not terminated from employment. We do not consider this case inasmuch as the court of appeals vacated the district court's decision for failure to explain in sufficient detail its determination to grant summary judgment. 974 F.2d 631, 644 (5th Cir.1992).

### B.

Both parties have cited ERISA cases in addition to those relied upon by the district court. We have examined these decisions, and others not cited by the parties, but find

them of little help. Each case subject to de novo review turns on interpretation of specific language contained in a qualified plan. The language claimed to trigger entitlement to benefits must be construed in light of the entire plan. Plans that contain restrictive language such as "permanently terminated" or "laid off" rather than simply "terminated from employment" are inapplicable to our determination and furnish little guidance. Similarly, cases involving severance pay and plans that require "separation from service" do not persuade us. These plans grant payments to offset the effects of unemployment, while the Quantum Plan has a different purpose.

We stated in *Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 950 (6th Cir.), *cert. denied*, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990), that "[c]ourts should proceed carefully before applying rules developed specifically to ferret out arbitrary and capricious action when interpreting the terms of a plan *de novo.*" (citations omitted). Many of the cases we have examined were decided under the arbitrary and capricious standard; thus, they have limited, if any, applicability.

### C.

 The question of whether the language of the Plan is ambiguous is a question of law requiring de novo review. *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1003 (6th Cir.1993). The language is ambiguous if it is subject to two reasonable interpretations. *Smith v. ABS Indus.*, 890 F.2d 841, 846–47 n. 1 (6th Cir.1989) (quoting *International Union, UAW Local 91 v. Park–Ohio Indus.*, 876 F.2d 894 (6th Cir.1989) (unpublished per curiam) ("[B]oth parties have offered plausible interpretations of the agreement drawn from the contractual language itself [which] demonstrates that the provision is ambiguous.")).

 The phrase at issue in this case is ambiguous. Both parties have offered plausible interpretations of the Plan language, and there is authority supporting either construction. Because the language in the Plan

is reasonably susceptible to either interpretation, we may look at any extrinsic evidence available.

[I]f the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence.

*Boyer v. Douglas Components*, 986 F.2d at 1005 (citing *In re White Farm Equipment Co.*, 788 F.2d 1186, 1193 (6th Cir.1986)). When interpreting a contract, courts look not only at the language, but also for additional evidence that reflects the intent of the contracting parties. See *Firestone v. Bruch*, 489 U.S. at 112–13, 109 S.Ct. at 955–56.

 Unlike some courts, we have held that a court conducting a de novo review in an ERISA case is confined to evidence that was included in the record upon which the administrator based its decision. *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990). This rule does not prevent our looking at the two communications about the Plan from Quantum to the Emery Division employees. Because these documents are part of the administrative record they may be considered in our de novo review.

The ESOP was created unilaterally by Quantum and this makes it somewhat difficult to determine "the true 'intention' of the parties." *Taylor v. Continental Group*, 933 F.2d 1227, 1232 (3d Cir.1991) (citation omitted). "In this situation, the reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify ambiguities." *Id.* We believe in this case "the reasonable understanding of the beneficiaries"—i.e. the employees—can be ascertained. The employees were never given copies of the Plan but derived their understanding of the Plan from the two documents [1] that were distributed to them by Quantum: the "Dear Quantum Employee" letter and the "Profit Sharing Stock Bonus Plan" newsletter. As pointed out earlier, both of these documents told the employees that their accounts would be distributed to

---

1. The fact that the two documents did not qualify as SPDs is immaterial. We use their content to clarify the meaning of the Plan, not to contradict it.

them when they "le[ft] Quantum." As the plaintiffs have repeatedly stated, they believed that when they began to work for Henkel, they had left Quantum and were entitled to their distributions.

The defendants claim that it was never their intention to make a distribution upon the sale of a division. According to Quantum, they did not believe they were even *permitted* to make a distribution under the Plan because sale of a division was not equivalent to termination. However, although the defendants now claim that they never intended "termination" to include a division sale, the evidence in the record indicates otherwise.

The purpose of the Stock Bonus Plan was motivational: the promise of a bonus commensurate with the success of the company would inspire the employees to increase productivity. To keep an employee as a participant in this plan after the employee left the company would in no way further that purpose. Therefore, the letter said, "You receive the value of your account when you leave Quantum."

■ Based on these statements, which were voluntarily distributed by the company, it is reasonable to infer that the "employment" relationship that was of primary concern to Quantum was the "employment" with Quantum. According to the newsletter, Quantum wanted to provide "all employees with ownership of the company." The plan defines "Employees" as employees of Quantum. Therefore, when that employee/employer relationship was severed, "employment" had been terminated.

## VII.

The determination that the change in the plaintiffs' status following sale of the Emery Division to Henkel constituted a termination of employment does not end our inquiry. Acting pursuant to a right reserved in the Plan, Quantum amended the Plan in December 1989, effective April 15, 1989, to provide for distributions, in its discretion, to employees of a subsidiary sold by Quantum who are hired by the purchaser. Quantum argues that the Plan did not permit a distribution

based on a sale of corporate assets constituting a division until this amendment was adopted. The question is whether this retroactive amendment could diminish the amount of the distributions the plaintiffs would have received if they were entitled to have their distributions valued as of April 30, 1989.

■ An employer may amend or terminate an employee welfare benefit plan at any time and, in doing so, the employer does not act as a fiduciary. *Adams v. Avondale Industries*, 905 F.2d at 947. Benefits under a welfare benefit plan do not vest as a matter of law under ERISA. *Id.* Nevertheless, "the parties may themselves set out by agreement or by private design, as set out in the plan documents, whether ... welfare benefits vest, or whether they may be terminated." *In re White Farm Equipment Co.*, 788 F.2d 1186, 1193 (6th Cir.1986). The Quantum Plan does provide in § 6.01 that "[a] Member shall become 100% vested in his Account upon his completion of two years of Vesting Service." Section 1.34 defines "Vesting Service" as the period of an employee's employment by Quantum or an affiliate, beginning with his first hour of employment and ending with the employee's severance date. Thus, as to the plaintiffs and members of the certified class who had two years of vesting service the question remains whether the retroactive amendment can have the effect of diminishing the value of their accounts for distribution purposes below the April 30, 1989, value.

■ Even though Quantum had the right to amend the Plan and was not acting as a fiduciary in doing so, Quantum's argument requires us to answer the question of whether the plaintiffs' contractual right to distribution, triggered by the April 17 sale to Henkel and resulting termination of their employment, could be denied them by reason of an amendment back-dated to be effective two days before the sale. The district court did not reach this question, having determined that there was no termination by reason of the sale itself.

■ As the Supreme Court pointed out in *Firestone v. Bruch*, "ERISA was enacted 'to promote the interests of employees and their

beneficiaries in employee benefit plans' ... 'and to protect contractually defined benefits.'" 489 U.S. at 113, 109 S.Ct. at 956 (citations omitted). The distribution rights under the Plan are "contractually defined benefits." We conclude that the amendment cannot have the effect of diminishing the value of accounts of those members of the plaintiff class that have vested.

Quantum adopted this amendment pursuant to its reserved powers under § 11.01 of the Plan. Section 11.01, in pertinent part, provides that

> The Board of Directors reserves the right at any time and from time to time, and retroactively if deemed necessary or appropriate, to amend in whole or in part any or all of the provisions of the Plan.... *No amendment shall be made which has the effect of decreasing the balance of the Account of any Member....*

(emphasis added). Clearly, Quantum had the right to make this amendment and to apply it retroactively. Under the terms of the Plan, however, this amendment cannot be used to decrease account balances. Thus, the value of account balances of those Emery Division employees who were terminated by the sale and who chose lump sum settlements were fixed as of April 30, 1989, and the December amendment could not decrease or diminish them.

Even if § 11.01 did not contain the prohibition against an amendment decreasing account balances, Quantum's act of amending the Plan after the sale and after the plaintiffs had filed their applications for distribution would raise a serious question. As then Chief Judge Hillman stated in *Edward W. Sparrow Hospital Ass'n, Inc. v. Industrial Welding, Inc.*, 1990 U.S. Dist. LEXIS 9194 (W.D. Mich., July 19, 1990), "Once a participant became entitled to coverage under the then existing terms of the Plan, it would be entirely illusory to allow [the employer] to essentially divest them of that right by retroactively deleting the benefit." *Id.* at 20. We

do not imply that Quantum acted improperly in adopting the December amendment. As a matter of law, however, given our interpretation, the amendment cannot have the effect that Quantum seeks.

The judgment of the district court granting summary judgment to the defendants is REVERSED and the case is REMANDED with directions to enter judgment for the plaintiffs. The district court will determine which class members' account balances were vested on April 17, 1989, and value those accounts.[2]

KENNEDY, Circuit Judge, dissenting.

Because I conclude that the Plan at issue in this case is of the kind that clearly gives the administrator discretion "to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), I respectfully dissent.

Section 7.01(c) of the Plan was amended in December 1989, retroactive to April 15, 1989, to provide:

> [i]n the event of the termination of the Plan without establishment of a successor plan, or in the event of the sale by an Employer of substantially all of the assets of a trade or business or the sale of a subsidiary of an Employer, provided that in the case of such a sale the Member continues employment with the buyer, the entire amount to the credit of the Member's Accounts may be distributed, in the [administrator's] discretion....

The Internal Revenue Code permits employers to make retroactive amendments to stock bonus plans such as the Plan here, effective as of the first day of the plan year. 26 U.S.C. § 401(b). Thus, we must also consider this amended provision in determining whether the trustees had discretion.

---

2. Presumably, the class would not include those employees who elected to have their accounts remain in the Plan. While the district court identified the class as all those employed at St. Bernard plant who were Plan participants, the motion for certification specifically targeted

those St. Bernard employees who "were subject to the allegedly improper calculation." Those employees, if any, who elected to remain in the Plan would not have been affected, and therefore should not be included in the class.

Section 8.07 of the Plan provides that the committee "from time to time shall establish rules for the administration of the Plan and the transaction of its business. The determination of the Committee as to any disputed question shall be conclusive." Plans with similar language have been held to invoke the arbitrary and capricious review standard. *See, e.g., Johnson v. Eaton Corp.,* 970 F.2d 1569, 1571–72 (6th Cir.1992) (holding arbitrary and capricious standard applicable given plan's terms that administrator "shall have all such powers and authority as may be necessary to carry out the provisions of this Plan," that administrator may "establish rules for the administration of this Plan ... and [to] determine the application of such rules," and that administrator's decision on the denial of claims "shall constitute the final disposition under [the] Plan."); *Callahan v. Rouge Steel Co.,* 941 F.2d 456, 459 (6th Cir. 1991) (holding arbitrary and capricious standard applicable given plan's terms that "[f]inal decisions shall be made by the Company as to the interpretation and application of this policy," and that fiduciary is granted "discretionary authority ... [to] construe the terms of the plan."). In this case, the administrator's power to resolve disputes over the terms of the Plan, including the distribution, is evident by the administrator's authority under section 8.07 to have its decisions over any disputed question be deemed conclusive. *See Johnson,* 970 F.2d at 1572. Given the language in sections 8.02 and 8.07, as well as the language in section 7.01(c), I would review Quantum's interpretation of the phrase "termination of employment" under an arbitrary and capricious standard. The majority limits section eight's discretion to disputes as to the meaning and application of any rules the committee might establish pursuant to the first sentence of section 8.01. That first sentence reads:

> The general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be placed in a committee of not less than three persons appointed from time to time by the Board of Directors to serve at the pleasure of the Board of Directors.

I cannot read the sentence so restrictively, especially in view of section 8.02 which provides:

> The members of the Committee shall elect a chairman from their number and a secretary who may be but need not be one of the members of the Committee; may appoint from their number *such subcommittees with such powers as they shall determine;* may authorize one or more of their number or any agent to execute or deliver any instrument or make any payment on their behalf; may retain counsel, employ agents and provide for such clerical, accounting, and consulting services as they may require in carrying out the provisions of the Plan; and may allocate among themselves or delegate to other persons all or such portion of their duties under the Plan, other than those granted to the Trustee under the trust agreement adopted for use in implementing the Plan, as they, in their sole discretion, shall decide.

(Emphasis added.)

A decision of a plan administrator is not arbitrary and capricious when it is possible to offer a rational explanation, based on the evidence, for that outcome. *Wells v. United States Steel & Carnegie Pension Fund, Inc.,* 950 F.2d 1244, 1248 (6th Cir.1991). Thus, even if an aggrieved applicant offers a reasonable interpretation of the terms of a plan that conflicts with that of the administrator, we should not disturb the decision of the administrator so long as that interpretation is also reasonable. *Id.*

I cannot find that the administrator's interpretation, that a "termination of employment" did not occur when Quantum sold its division and its employees continued to work for the purchaser without interruption, was unreasonable.

I am unable to agree that the tax cases relied on by the District Court are not helpful. The Internal Revenue Code, subsection 401(a), governs whether an employee's stock ownership plan, or any other retirement plan, is qualified for tax-favored status. Plan administrators must comply with Revenue Rulings which do not consider an employee "separated from service" where he or she

continues in the same job for another employer. Rev. Rul. 79–336, 1979–2 C.B. 187 and Rev. Rul. 81–141, 1981–1 C.B. 204. The Plan had to comply with tax laws to be approved so contributions could be deductible.

At the time of the sale of the Emery Division, the Plan provided for distributions upon a participant's "termination of employment." It also permitted former employees to remain members, that is, participants in the Plan, until benefits were distributed and to defer distribution until age 70 1/2. The Plan provides for methods of requesting distributions. Yet, plaintiffs did not formally elect distribution of their accounts. Under the terms of the Plan, a member is not entitled to distribution prior to age 65, unless he or she formally elects distribution. Thus, even if I were to agree with the majority's analysis, plaintiffs are not entitled to summary judgment.