The Estate of Judith M. CENCULA, deceased, by Arthur Cencula, Sr., Independent Administrator, Plaintiff,

v.

JOHN ALDEN LIFE INSURANCE COMPANY, John Alden Contract Construction Group Trust, Patrick Fatigato, and Quest Financial Group, Inc., Defendants.

No. 98 C 0562.

United States District Court,
N.D. Illinois,
Eastern Division.

May 1, 2001.

Alvin R. Becker, Christopher A. White, Beerman, Swerdlove, Woloshin, Barezky, et al., Chicago, IL, for plaintiff.

Mark Caldwell Meyer, Robert L. Larsen, Cunningham, Meyer & Vedrine, P.C., Wheaton, IL, for Patrick Fatigato, Quest Financial Group, Inc., defendants.

Sheldon I. Minkow, Sheldon I. Minkow & Associates, Chicago, IL, for Cencula & Sons Builders, Arthur Cencula, Sr.

### MEMORANDUM OPINION AND ORDER

ASHMAN, United States Magistrate Judge.

Plaintiff, the Estate of Judith Cencula, by Arthur Cencula as Independent Administrator, brought suit against Defendant, John Alden Life Insurance Company, to recover unpaid medical benefits under the terms of a group insurance plan. On March 28, 2000, this Court granted Plaintiff's Motion for Summary Judgment as to liability, finding Defendant accountable for Plaintiff's unpaid medical bills.

Two months later, on May 30, 2000, Plaintiff and Defendant negotiated a settlement agreement. Consequently, the case was dismissed with prejudice with the understanding that this Court retained jurisdiction for the purpose of enforcing the settlement agreement. Now, pursuant to that provision, Plaintiff brings a Petition to Enforce Settlement Agreement and for Other Relief. Plaintiff contends that Defendant has acted in bad faith by failing to carry out the terms of the settlement agreement within a reasonable time. For the reasons that follow, Plaintiff's petition is granted in part and denied in part.

### I. Background

As more fully described in *Cencula v. John Alden Life Insurance Co.*, No. 98 C 0562, 2000 WL 336522 (N.D.Ill. Mar.28, 2000), this case commenced as a result of Defendant's refusal to pay insurance claims that accrued as a result of Judith Cencula's fatal bout with cancer. On October 6, 1998, one of Plaintiff's claims was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). But on March 28, 2000, this Court found Defendant liable for Plaintiff's unpaid medical bills pursuant to the terms of Defendant's group insurance plan.

With Defendant's liability determined, the parties turned their attention to damages. During a settlement conference on May 30, 2000, the parties reached an oral agreement and the case was dismissed with prejudice. In exchange for a release from all claims, Defendant agreed to reimburse Plaintiff for certain out-of-pocket prescription expenses and premium payments, to pay Plaintiff's attorney's fees, and to satisfy numerous outstanding medical bills. Apparently, Defendant promised to reduce the agreement to writing and to submit a copy to Plaintiff for review within two weeks time.

However, the two weeks came and went without communication from Defendant regarding the settlement agreement. Plaintiff telephoned Defendant to inquire about the delay and left a voice-mail message reminding Defendant that the written settlement agreement was overdue. Defendant never returned the call.

Shortly thereafter, Plaintiff asked this Court to intervene. Specifically, Plaintiff

sought to vacate the requirement of a written settlement agreement and to have this Court pronounce the terms of the oral settlement agreement in a court order. That relief proved unnecessary, however, because discussions both in and out of court finally led to Defendant's delivery of a written settlement agreement to Plaintiff on July 14, 2000. Plaintiff reviewed, edited, signed, and returned the agreement to Defendant that same day. Consequently, Plaintiff withdrew his Motion to Enforce Settlement Agreement and for Other Relief.

To Plaintiff's satisfaction, the written settlement agreement contained all of the orally agreed upon terms that Plaintiff anticipated. The agreement contained provisions requiring Defendant to reimburse Plaintiff for out-of-pocket prescription expenses and insurance premiums, to pay Plaintiff's attorney's fees, and to satisfy all of the outstanding medical bills that Judith Cencula incurred. The agreement also established a time frame in which Defendant was obligated to make some of those payments. For instance, the agreement required Defendant to reimburse Plaintiff for the out-of-pocket prescription expenses and to pay Plaintiff's attorney's fees immediately. But for other matters such as Defendant's obligation to pay Plaintiff's unpaid medical bills, the agreement contained no specific time reference.

Nonetheless, the agreement did require Defendant to "exercise all due diligence" in carrying out the terms of the agreement. (See Pet. Enforce Settlement & Other Relief Ex. C at 4.) Oddly, however, the agreement contained no provision dealing with breach of the agreement. Furthermore, the agreement contained no provision for attorney's fees in the event one party had to come into court to enforce the settlement agreement.

The first payments under the settlement agreement came trickling in around July 20, 2000. At that time, Defendant paid $3,257.16 to Plaintiff for out-of-pocket prescription expenses, $600 to Plaintiff for insurance premiums, and $80,000 to Plaintiff for attorney's fees. Allegedly these payments were seven weeks overdue. Defendant never provided Plaintiff with a reason for the delay.

But Plaintiff was not the only one who was experiencing difficulty receiving payment. On August 4, 2000, the University of Chicago Hospitals sent a letter to Plaintiff demanding payment of a $130,310.88 bill. Evidently, Chicago Hospitals knew of the settlement and grew tired of waiting for its share. Another letter sent by Chicago Hospitals on October 2, 2000, apprised Plaintiff of Chicago Hospitals's frustrated dealings with Defendant. Purportedly, Defendant refused to agree to any particular sum for satisfaction of the outstanding medical bill or to provide Chicago Hospitals with an indication of when Chicago Hospitals would receive any money at all. As a result, Chicago Hospitals threatened to increase the amount due from $130,310.88 to $153,612.68, recanting its willingness to discount the bill. The apparent point of contention between Chicago Hospitals and Defendant concerned conflicting interpretations of the Illinois Probate Act.

With no end in sight, on October 11, 2000, Plaintiff returned to court. Plaintiff filed a Petition to Enforce Settlement Agreement and for Other Relief asking this Court to enter judgment against Defendant in the amount of $153,612 for payment to Chicago Hospitals, to impose upon Defendant a $25,000 statutory penalty for Defendant's dilatory conduct, to award Plaintiff attorney's fees for bringing the petition, and to require Defendant to submit a monthly written report to Plaintiff

detailing Defendant's progress in settling the unpaid claims.

The petition led to additional court appearances. Then on November 30, 2000, this Court granted Plaintiff part of the relief requested by requiring Defendant to submit monthly status reports to Plaintiff detailing Defendant's efforts to discharge its payment obligations under the settlement agreement. At that time, Chicago Hospitals and the various other medical service providers remained unpaid.

Defendant sent its first monthly report to Plaintiff on December 20, 2000. In the report, Defendant informed Plaintiff that Defendant had paid Chicago Hospitals and two other medical service providers a total of $170,000. Defendant also promised that additional payments to other medical service providers would be forthcoming.

Plaintiff, however, remains unsatisfied. Plaintiff still seeks the $25,000 penalty and attorney's fees requested in the October petition. Plaintiff's justification for this is twofold. First, Defendant should not be allowed to benefit from holding $170,000 for seven months longer than it should have. Second, Defendant would have neither made the December payments nor performed any of its obligations under the settlement agreement but for Plaintiff's efforts both in and out of court. Plaintiff posits that the relief sought is available pursuant to the Illinois Insurance Code or, in the alternative, that at least the attorney's fees are available under ERISA. We address each of these contentions below.

## II. *Discussion*

### A. Illinois Insurance Code

Plaintiff first asks this Court to award Plaintiff up to $25,000 in penalty fees [1] and $3,687.50 in attorney's fees under the Illinois Insurance Code. At first blush, the argument seems appealing. The Illinois Insurance Code expressly provides that "[i]n any action by or against a company ... for an unreasonable delay in settling a claim [where] it appears to the court that such action or delay is vexatious and unreasonable," the court may award attorney's fees and a penalty of up to $25,000. 215 ILCS 5/155(1). Here Plaintiff's averment that Defendant, an insurance company, has failed to timely settle outstanding claims as set forth in the settlement agreement suggests a dispute merely as to the issue of unreasonable and vexatious delay, where state law provides the appropriate standard.

But a closer look reveals that there is much more at issue. Indeed, as Defendant points out and Plaintiff later somewhat concedes, because ERISA governed the initial claim that gave rise to the settlement agreement, ERISA has a role in the analysis of this enforcement action. *See Boren v. N.L. Indus., Inc.*, 889 F.2d 1463, 1465–66 (5th Cir.1989); *Bridge v. McHenry Truck Lines, Inc.*, No. 96 C 4628, 1998 WL 427611, at *3–7 (N.D.Ill. July 24, 1998); *Cairns v. Bridgestone/Firestone, Inc.*, 802 F.Supp. 152, 158–60 (N.D.Ohio 1992). That role necessarily contemplates federal preemption.

ERISA's preemption clause, § 1144(a), declares that all state laws shall be preempted "insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This general preemption clause is limited by the savings clause that excepts from preemption state

---

**1.** Plaintiff argues that at least $9,420 should be awarded under the penalty provision. This amount, says Plaintiff, would represent the interest that Defendant earned by holding the $170,000 unjustly from May 2000 to December 2000. (*See* Reply Mem. Supp. Pl.'s Pet. Enforce Settlement Agreement & Other Relief at 6.)

laws that "regulate insurance." *Id.* § 1144(b)(2)(A).

■■■ Though the parties failed to address the first prong of the two-pronged preemption analysis—the general preemption clause of § 1144(a)—this Court finds it necessary to do so. As the Supreme Court has announced on numerous occasions, the phrase "relates to" should be given its "broad common-sense meaning." *Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). A state law "relates to" an employee benefit plan if that law has a "connection with" or makes "reference to" the plan. *See id.* (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The character of the action is the controlling factor of the analysis: "It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Zuniga v. Blue Cross & Blue Shield of Mich.,* 52 F.3d 1395, 1401 (1995) (quoting *Cromwell v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir.1991)). Another important factor in determining whether a state law relates to an employee benefit plan is whether the action will "directly affect the relationship [between] traditional ERISA entities." *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir. 1990).

■■■ Before the underlying lawsuit was settled, Plaintiff's initial claim against Defendant was made in pursuance of plan benefits. Plaintiff was a plan participant in Defendant's ERISA benefit plan, and Plaintiff's claim was brought under § 1132(a)(1)(B) and (g) to recover "benefits due ... under the terms of [the] plan" and attorney's fees for bringing the action. The entire lawsuit arose out of and was centrally linked to Defendant's administration of an ERISA plan.

We can think of no sound reason why the mere fact that a settlement agreement is in place should change this characterization. The settlement agreement similarly arose out of and is centrally linked to Defendant's administration of an ERISA plan. Indeed, Plaintiff's instant petition originally sought the same benefits that Plaintiff's initial complaint first sought in the underlying lawsuit. And presently Plaintiff seeks attorney's fees for bringing the petition that led to these claims being paid, just as Plaintiff sought attorney's fees for bringing the original lawsuit to have the claims paid. Consequently, the fact that a settlement agreement is in place does not alter the analysis. The label of the action and the documents we consider may have changed, but the substance has not. The same significant substantive rights that are intimately linked to Defendant's ERISA plan remain at issue. Hence, the first factor favors preemption.

Moreover, resolution of Plaintiff's instant petition will undoubtedly affect the relationship between traditional ERISA entities—a benefit provider and a plan participant. Thus, both factors support ERISA preemption.

This is hardly anything new. Prior decisions in this district are clear: every court in the Northern District of Illinois that has addressed the issue has held that section 155 relates to an ERISA plan. *See, e.g., Gawrysh v. CNA Ins. Cos.,* 978 F.Supp. 790, 793 (1997); *Lutheran Gen. Hosp., Inc. v. Mass. Mut. Life Ins. Co.,* No. 95 C 2504, 1996 WL 124449, at *3 (N.D.Ill. Mar. 12, 1996); *Goodhart v. Benefit Trust Life Ins. Co.,* No. 90 C 5110, 1990 WL 205821, at *3 (N.D.Ill. Nov. 29, 1990); *Buehler Ltd. v. Home Life Ins. Co.,* 722 F.Supp. 1554, 1560–61 (N.D.Ill.1989). Though no other court has had an opportunity to analyze

the issue in the context of a petition to enforce a settlement agreement, this novel posture bears little significance for the reasons stated above. Accordingly, for purposes of this enforcement action, Plaintiff's request for relief under section 155 "relates to" Defendant's ERISA benefit plan and therefore falls within the general preemption clause of § 1144(a).

■ As per the second prong, ERISA's savings clause, a state law will be saved from preemption only if it satisfies three requirements: (1) a common-sense interpretation of the state law must suggest that it regulates insurance, (2) the state law must regulate the "business of insurance" as defined by case law interpreting the McCarran–Ferguson Act, and (3) allowing the state claim to proceed must not undermine ERISA's civil enforcement procedures. *See Gawrysh,* 978 F.Supp. at 793.

■ Because section 155 provides remedies for unreasonable or vexatious delay in paying *insurance claims,* a common-sense interpretation of section 155 suggests that it regulates insurance. *See id.* With regard to the second requirement, an analysis of what have been termed the McCarran–Ferguson factors,[2] the district courts

in this circuit are split when it comes to section 155. *See id.* For instance, some courts have found that section 155 is not an integral part of the relationship between the insured and insurer, while others have. *See id.* However, just like the *Gawrysh* court, this Court need not weigh in on the debate because the third savings clause requirement is controlling. It is clear that § 1132(a) is meant to be the exclusive provision for civil enforcement of rights under ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51–54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Allowing Plaintiff to assert a claim under section 155 would undermine ERISA's enforcement procedures; therefore, Plaintiff's claim under the Illinois Insurance Code is preempted. *See Gawrysh,* 978 F.Supp. at 793–94. If Plaintiff wants relief, Plaintiff must look to ERISA.

Plaintiff's reliance on the Supreme Court's holding in *UNUM Life Insurance Co. of America v. Ward,* 526 U.S. 358, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999), is unfounded. There, the Court did not address § 1132(a)'s exclusivity except to state explicitly that the issue was not implicated by the facts of the case.[3] *See id.* at 376–77, 119 S.Ct. 1380; *Moran v. Rush*

---

2. The McCarran–Ferguson factors, which determine whether a state law regulates the "business of insurance" for purposes of § 1144(b)(2)(A), are as follows: (1) whether the state law has the effect of transferring or spreading policyholder risk, (2) whether the state law is an integral part of the policy relationship between the insurer and insured, and (3) whether the state law is limited to entities within the insurance industry. *See Milano v. Conn. Gen. Life Ins. Co.,* No. 92 C 1606, 1992 WL 168801, at *3 (N.D.Ill. July 13, 1992).

3. The *UNUM* Court mentioned in a footnote that the Solicitor General had submitted an amicus brief in which he apparently reversed the position he argued in *Pilot Life*—that § 1132(a) is meant to be the exclusive provi-

sion for the enforcement of ERISA rights. *See UNUM Life Ins. Co. of Am.,* 526 U.S. at 376 n. 7, 119 S.Ct. 1380. This casual mention, however, is insufficient justification to disregard the well-followed rule of *Pilot Life* that § 1132(a) is the sole and exclusive repository for remedies under an ERISA plan. *See Pilot Life Ins. Co.,* 481 U.S. at 51–54, 107 S.Ct. 1549; *Chilton v. Prudential Ins. Co. of Am.,* 124 F.Supp.2d 673, 681–84 (M.D.Fla.2000) (finding that the "sweeping language of *Pilot Life* was not undone by *UNUM*"). *But see Gilbert v. Alta Health & Life Ins. Co.,* 122 F.Supp.2d 1267, 1273 (N.D.Ala.2000) (holding that the Alabama tort for bad faith refusal to pay benefits is not preempted by ERISA because the tort is allowable only to insurance policies).

*Prudential HMO, Inc.*, 230 F.3d 959, 971–72 (7th Cir.2000) (similarly not addressing § 1132(a)'s exclusivity). Hence, *UNUM* did not dramatically alter the landscape when it comes to the preemptive effect of ERISA on state law enforcement actions such as those based on section 155, and *Pilot Life* remains good law. According to *Pilot Life*, Plaintiff cannot obtain the penalties and fees available under section 155 because that claim is preempted by ERISA. *See Pilot Life Ins. Co.*, 481 U.S. at 51–54, 107 S.Ct. 1549.

## B. Section 1132(g) of ERISA

■ However, Plaintiff's claim for attorney's fees falls squarely within § 1132(g) of ERISA. ERISA grants this Court discretion to award attorney's fees to either party. *See* 29 U.S.C. § 1132(g)(1). To determine whether to award attorney's fees under ERISA, courts may use one of two tests. The substantially justified test simply looks at whether the losing party's position was substantially justified. *See Brewer v. Protexall, Inc.*, 50 F.3d 453, 458 (7th Cir.1995). While the five-factor test takes a broader approach to determine if fees are warranted. *See id.* at 458–59. Because Plaintiff is the one seeking fees, the five-factor test is better suited to the instant dispute. *See Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 829 (7th Cir. 1984).

■ Factors to consider while applying the five-factor test are (1) the degree of the offending party's culpability or bad faith, (2) the offending party's ability to satisfy an award of fees, (3) whether an award of fees would deter other persons under similar circumstances, (4) the amount of benefit conferred on members of the plan as a whole, and (5) the relative merits of the parties' positions. *See Brewer*, 50 F.3d at 458. The five-factor test is not meant for rigid application, but rather it provides a general outline for awarding fees. *See Denzler v. Questech, Inc.*, 80 F.3d 97, 104 (4th Cir.1996) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir.1993)). Some factors may not apply to any given case. *See id.*

■ Three of the factors lead us to believe that an award of attorney's fees is proper in this case. First, with respect to Defendant's degree of culpability or bad faith, the length of time it has taken Defendant to perform under the settlement agreement is good evidence of bad faith, especially because Defendant has not proffered an adequate excuse for all of the delays. *See, e.g., Tyler v. Ploof Truck Lines, Inc.*, No. Civ.A. 96–T–1192–E, 1999 WL 961262, at *2 (M.D.Ala. Sept. 17, 1999) ("[P]rolonged failure to pay the claims pursuant to the settlement agreement and . . . lack of an excuse for doing so constitute bad faith."). Although the instant petition deals primarily with late payments to Chicago Hospitals and the other medical service providers, we note that Defendant's casual approach to performing its obligations under the settlement agreement began much earlier than that. Defendant did not timely deliver the written settlement agreement, did not timely reimburse Plaintiff for certain out-of-pocket prescription expenses and premium payments, and did not timely pay Plaintiff's attorney's fees. Defendant belatedly performed these obligations, and only after Plaintiff dragged Defendant back to court. Furthermore, Defendant never provided an explanation for the delay.

This same pattern of conduct continued for another five months. It took until late December 2000 for a single payment to be made to the medical service providers. Again, payment was not made until after Plaintiff dragged Defendant back into court, and again Defendant offered no good explanation for the delay.

True, Defendant did offer one reason for the delay—its attempt to avoid liability for certain bills under the Illinois Probate Act. Nonetheless, Defendant presented no evidence that this matter took seven months to resolve (or that it could have). Entire lawsuits are often resolved in seven months.

The excessive length of time that it took Defendant to perform under the settlement agreement paints only part of the picture of Defendant's bad faith. Certainly Chicago Hospitals's frustration with Defendant evidences bad faith as well. Chicago Hospitals experienced periods of time in the dark regarding Defendant's intent to pay. Several unreturned telephone calls did nothing to help the matter. Additionally, the fact that this Court deemed it necessary to impose a reporting requirement on Defendant to monitor Defendant's efforts in settling claims evidences Defendant's bad faith. Finally, we do not believe it to be mere coincidence that Defendant only performs its obligations under the settlement agreement after this Court intervenes. Under the circumstances, the requisite level of Defendant's culpability and bad faith is properly established.

In terms of the second factor, the ability of the party to pay an award of attorney's fees, Defendant, one of the nation's largest insurance companies, fails to proffer any reason why it would be unable to satisfy Plaintiff's requested amount of attorney's fees. Lastly, with regard to deterrence, the third factor, an award of attorney's fees in this situation would deter other insurers from engaging in similar stalling tactics or foot-dragging after a settlement agreement has been put in place. Altogether, these three factors provide ample support for awarding attorney's fees.[4] Defendant's inexcusable delay cannot be overlooked. Accordingly, Defendant must pay Plaintiff's attorney's fees in bringing this petition in the amount of $3,687.50.[5]

---

**4.** Defendant points out in its brief that it paid $80,000 to Plaintiff for attorney's fees under the settlement agreement even though actual legal bills only amounted to $47,436.25. (*See* Def.'s Resp. Pl.'s Pet. Enforce Settlement Agreement & Other Relief at 7.) Defendant then suggests that the "excess" Plaintiff received should be used to cover any fees that Plaintiff expended in bringing the instant petition. We take issue with the proposition. The parties did not contemplate Defendant's dilatory conduct at the time the settlement agreement was signed, and we will not graft such a provision into the agreement.

**5.** Plaintiff included this amount in his Reply Memorandum in Support of Plaintiff's Petition to Enforce Settlement Agreement and for Other Relief. (*See* Reply Mem. Supp. Pl.'s Pet. Enforce Settlement Agreement & Other Relief Ex. A.) Defendant never raised an objection to the reasonableness of this amount at oral argument, and our own review of Plaintiff's billing statement reveals no impropriety. Accordingly, we hold Defendant liable for this amount.